[No. 14145.   Department One.   November 23, 1917.]

STELLA RUTLEDGE CRODLE, *Appellant*, v. EMMA BELLE
DODGE *et al.*, *Respondents*.[1]

CANCELLATION OF INSTRUMENTS—DEEDS—MUTUAL MISTAKE—WANT
OF CONSIDERATION.   Where a simple, unlettered, inexperienced girl,
within a few weeks after attaining her majority, was induced, with-
out consideration, to convey her interest in her mother's estate,
upon a request to sign a paper merely authorizing her aunt to
manage and control the property until other heirs became of age,
the deed of conveyance failed to express the true intent of either of
the parties, and is open to attack upon the ground of mutual
mistake.

ESTOPPEL—LACHES—DELAY SHORT OF LIMITATIONS.   Mere delay
short of the statute of limitations by an heir in bringing suit to re-
cover an interest in land, will not operate as an equitable estoppel,
where no adverse equities have arisen in the interim, the claim was
known to those claiming adversely, and there was no fraud or bad
faith.

USE AND OCCUPATION—RENTS AND PROFITS—WASTE—ACCOUNTING.
There is no right to an accounting in favor of one who gave control
of farm property to an aunt, permitting her to occupy the same and
use the proceeds, for a considerable period without any demand for
an accounting; except as to waste by the removal of timber, as to
which the right to an accounting must be recognized, where suit to
recover the property was seasonably commenced.

Appeal from a judgment of the superior court for Thurs-
ton county, D. F. Wright, J., entered December 18, 1916,
dismissing an action for equitable relief, tried to the court.
Reversed.

*Hugo Metzler* and *Ben S. Sawyer*, for appellant.

*Thomas M. Vance*, for respondents.

WEBSTER, J.—Some time prior to May 1, 1884, Laura E.
Smith made homestead entry on a quarter section of land in
Thurston county.   On that date she became the wife of
Marian Rutledge, and on March 4, 1885, the plaintiff, Stella

[1]Reported in 168 Pac. 986.

Rutledge Crodle, was born as the issue of this marriage. Thereafter and on August 4, 1891, a patent was issued by the United States, granting the land to the heirs of Laura E. Rutledge, deceased, which patent was filed for record in the office of the auditor of Thurston county on September 1, 1894. Two days after plaintiff's birth, her mother died intestate, leaving as her sole heirs at law Marian Rutledge, her surviving husband, and the plaintiff. About one week later, plaintiff was taken to the home of her maternal grandmother, Mrs. Webster, where she lived continuously as a member of the family until she reached the age of nineteen years, when she married Charles Crodle. At the time of the death of Mrs. Rutledge, her unmarried sister, Emma Belle Smith, was living with her mother and stepfather, and the plaintiff, who was an exceedingly frail, delicate child, was nursed and cared for by her aunt, Emma Belle, who lavished upon her the love and affection and extended to her the tender ministrations of a mother. In later years, plaintiff came to know and appreciate that she probably owed her life to the gentle nursing and unfailing attentions of her aunt.

On May 21, 1887, Marian Rutledge married Emma Belle Smith, the sister of his deceased wife, and about one year later moved to the homestead. As the result of this union, six children were born; namely, Cecil Rutledge, Chester Rutledge, Ethel Rutledge Weeks, Carl Rutledge, Laura Rutledge Vaspar and Florence Rutledge Freeman. Chester Rutledge never married, and died shortly after attaining his majority. Marian Rutledge, after the death of his first wife, erected upon the land a house, barn and some small outbuildings, which constitute the only improvements ever placed upon the homestead. On March 25, 1893, he died intestate, leaving as his sole heirs his surviving widow, Emma Belle Rutledge, and seven children, six, the fruits of his second marriage, and the plaintiff, the sole issue of the first. Neither the estate of Laura E. Rutledge, plaintiff's mother, nor that of Marian Rutledge, her father, was ever probated. After the death

of Marian Rutledge, his widow, her children and her uncle William Miles, a bachelor, continued to occupy the land, Mr. Miles joining the family a few weeks after the death of Mr. Rutledge. The plaintiff, as we have already noted, never lived on the homestead, but until her marriage to Mr. Crodle made her home with her grandmother and step-grandfather, the Websters, who lived on a ranch near the village of Tenino, about seventeen miles from the land in controversy.

On account of ill-health, the plaintiff was unable to attend school regularly, and consequently acquired a very meager education. She grew up on the farm, assisting her grandmother with the chores, and never knew the burden of business cares or responsibilities. Her clothing, while in part selected by herself, was paid for by her grandmother, and she led a simple, uneventful life. She was an inexperienced, unsuspecting, thoroughly dependent country girl. In disposition she was obedient, tractable and affectionate and, aside from her rather limited education, was about like most girls brought up under similar environment. Her aunt and stepmother made frequent visits to the Webster home, and very often, when matters out of the ordinary routine came up for consideration, she was called upon by the plaintiff and her grandmother for counsel and advice. During the same period, the plaintiff made frequent visits to the homestead, and the relations between her and Mrs. Rutledge were at all times cordial and affectionate. Prompted, no doubt, by the ties of blood and kinship, emphasized by a sense of gratitude, the plaintiff had implicit and unbounded confidence in her aunt. She accepted her advice and acted upon her suggestions readily and without question, and always manifested that abiding faith in her aunt which the threefold bond of foster-mother, aunt and stepmother would naturally beget and develop. This feeling of affection seems to have been reciprocated by the aunt. She professed the greatest love for the plaintiff and, notwithstanding this regrettable litigation, testified that the plaintiff was as "near and dear" to her as were her own children. When

plaintiff was quite young, she learned for the first time from her grandmother that the homestead, on which the Rutledge family was living at the time, formerly belonged to her mother, and when she was about fifteen years of age, her aunt, Mrs. Rutledge, informed her that she had some interest in the property. She did not know, however, the extent of her interest, nor was she acquainted with the character or value of the land or the timber upon it. She did not ascertain her true interest in the property until she consulted a lawyer looking to the bringing of this suit.

A few weeks after plaintiff's eighteenth birthday, Mrs. Rutledge wrote to her mother, requesting that the plaintiff come to the homestead for a visit. A little later, plaintiff went to the home of her aunt in response to the invitation and, shortly after her arrival, she was taken by her great-uncle, William Miles, over a portion of the land. He assured her that the ranch was a "rockpile" and that the timber was "conky" and of little commercial value. The evening of the same day, Mrs. Rutledge referred to the homestead in disparaging terms, as she had done on prior occasions in plaintiff's presence, and, according to the testimony of the plaintiff, said that she wished to have plaintiff sign a paper giving Mrs. Rutledge the management of the property—"the privilege of handling the property" until the children should become of age. Plaintiff claims she consented to sign such an instrument, relying entirely upon the suggestion of her aunt, and on the following day Mrs. Rutledge brought her to Olympia, and later went to the office of M. G. Royal, an attorney and notary public, where she executed a paper which, she alleges, she recently discovered was a deed quitclaiming her entire interest in the homestead to Emma Belle Rutledge. Plaintiff asserts that she did not read the instrument prior to signing it, and that its contents were not read or explained to her at that time; that, in ignorance of the true character of the writing and believing it to be a paper giving her aunt the authority to manage and control the property, she subscribed

her name thereto. It is undisputed that, prior to this time, the plaintiff had received no independent advice or counsel concerning her rights in the premises or the wisdom of signing the document, and did not know what a quitclaim deed really was.

From the record, it is not entirely clear when or where the deed in question was prepared, but an inspection of the original instrument, which was filed as an exhibit in the case, plainly discloses that a portion of it is in the handwriting of Mr. Royal, while a considerable part thereof, including the name of the grantee and the description of the property, is in different ink and written in an altogether different handwriting. From a careful study of all the evidence shedding light on this point, we are strongly inclined to the belief that a part of the deed either was prepared before plaintiff's visit to the notary's office or was inserted after she left. In reaching this conclusion we have given due weight to the presumption arising from the notarial certificate. The deed recites a cash consideration of $250 and was filed for record by Mrs. Rutledge on the date of its execution, May 21, 1903. It is admitted that the plaintiff did not receive any part of the amount mentioned in the deed, but an attempt is made to supply a consideration by claiming that William Miles agreed to give the plaintiff a cow and calf, valued at $25, if she would execute to Mrs. Rutledge a quitclaim deed. That this was a mere pretext and subterfuge is only too apparent from the record. The evidence convinces us beyond question that, about one year after the deed was signed and very shortly after plaintiff's marriage to Mr. Crodle, her great-uncle, William Miles, gave her a cow and calf as a wedding present, and that the gift had no relation whatever to the consideration named in the deed, and its execution was in nowise influenced thereby. From the entire evidence, there can be no doubt that there was absolutely no consideration for the conveyance. Thus it will be seen this simple, unlettered, inexperienced girl, within a few weeks after attaining her ma-

jority, conveyed away her birthright for less than a mess of pottage. On the day following the visit to Mr. Royal's office, Mrs. Rutledge and the plaintiff returned to the homestead, and a few days later the plaintiff went to the home of her grandmother. From that time until a few weeks prior to the commencement of this action, little or nothing was said to the plaintiff or in her presence concerning the transaction. The subject seems to have been entirely dropped as a topic of family discussion. About one year after the deed was signed, the plaintiff married and left the home of her grandmother. Since her marriage she has lived with her husband on a ranch near Offut Lake, in Thurston county, and until just before this suit was instituted, her relations with her aunt continued as before, and while they visited each other less frequently; plaintiff's affection for and confidence in her aunt seemed not to abate.

On June 5, 1906, for a recited consideration of $1,500 in hand paid, Mrs. Rutledge executed a deed to William Miles by which she undertook to convey to him the fee simple title to the entire 160 acres of land. It appears, however, that no part of the stated consideration was ever paid, but that the true consideration for the deed was an agreement on the part of Mr. Miles to execute a will devising the property at his death to Mrs. Rutledge for life, with remainder over to certain of her children. Such will was subsequently executed by Mr. Miles, but for some reason not disclosed by the evidence, he reconveyed the land to Mrs. Rutledge on November 16, 1910, for a recited consideration of $600. So that the title to the property now stands precisely as it did at the time of the signing of the instrument purporting to quitclaim to Mrs. Rutledge the interest of the plaintiff, save that the share formerly owned by Chester Rutledge, the deceased son, is now vested in his mother. In 1910, William Miles left the homestead, but Mrs. Rutledge remained and, with the assistance of her sons, continued to farm and manage the property. In March, 1915, she married the defendant Ives Dodge and

moved from the ranch, leaving it in charge of her son Cecil, who has since lived upon and cultivated it under the direction and instructions of his mother.

About this time the plaintiff was informed that the timber was being removed from the land; that Mrs. Dodge, as she then was, had settled with some of her children for their interests, and that the land was to be divided; whereupon the plaintiff secured the services of an attorney, who, after investigation, advised her fully as to her rights.

On May 8, 1915, this action was commenced for the purpose of cancelling the quitclaim deed on the grounds of fraud and want of consideration, and for an accounting. Such of the defendants as appeared in the action, including Emma Belle Dodge, filed answers containing certain admissions and denials not necessary to be stated and, at the trial, insisted that the relief sought by plaintiff should be denied on the ground of laches. Subsequently a decree was entered dismissing the action, from which the plaintiff appeals.

The insistence of the plaintiff that she was requested to sign a paper merely giving her aunt authority to "manage," "handle" and "control" the property and that she did not understand she was conveying her entire interest in the land, finds strong corroboration in the evidence of Mrs. Dodge, who testified as follows:

"Q. Then what did you mean when you answered Mr. Vance that up to this time, referring to the time the instrument was prepared, that you didn't know what a quit claim deed was 'only I knew it gave me power to manage,' that was the idea wasn't it? A. Yes. Q. In other words you wanted her to fix the property so you could have the management and control of it? A. Yes."

It is true she undertook later to qualify and change her testimony, but, taking her evidence as a whole, we are satisfied that, in making the above answers, she was speaking advisedly and intended to say precisely what the language implies. In the light of this evidence, we think it may be said

with reason that the instrument signed by the plaintiff failed to express the true intention of either of the parties, and therefore is open to attack on the ground of mutual mistake. In addition, Mrs. Dodge testified that the idea of procuring from plaintiff a writing of any sort did not originate with her, but arose upon the suggestion of Mr. Miles. She frankly admits that, when the subject was broached by her uncle, she did not know the meaning and effect of a quitclaim deed and, prior to that time, had given the matter no thought whatever. It is clear from the testimony that, at the time of the trial, she had but a vague and indefinite understanding of such an instrument; hence it is not surprising that she was of the opinion that the writing merely gave the right to manage and control the property. Mr. Miles testified that, while he knew the meaning of a quitclaim deed, he did not undertake to explain to the plaintiff what the legal effect upon her interest in the property would be if she should execute such an instrument. He stated that no one, so far as he knew, ever advised the plaintiff that if she signed and acknowledged such a document it would terminate her interest in the ranch. He is positive in asserting that he did not know whether the plaintiff understood the effect of executing such a deed at the time she subscribed her name to the one in question. Mrs. Dodge and Mr. Miles were the only persons with whom plaintiff consulted, or had opportunity of consulting, after the signing of the writing was suggested to her and before she went to the office of Mr. Royal and executed the deed. Both the plaintiff and Mrs. Dodge testified that they were in the notary's office but a few minutes upon the occasion of the signing of the document, and Mrs. Dodge does not undertake to say that the writing was read or explained to the plaintiff by Mr. Royal at that time.

We have grave doubt whether Mrs. Dodge, at the inception of the transaction, entertained a deliberate intention of perpetrating a fraud upon her niece. We are more inclined to think that the scheme was concocted by Mr. Miles

and that he was endeavoring to acquire the property for himself. Long prior to the execution of the deed by plaintiff, he purchased certain delinquent tax certificates against the land and subsequently instituted proceedings for their foreclosure. For some reason not disclosed he did not press the matter, and later abandoned it altogether. Some time thereafter he suggested to Mrs. Dodge the idea of procuring from the plaintiff a quitclaim deed, and busied himself in accomplishing such purpose. About two and one-half years after Mrs. Dodge obtained the deed, we find him in possession of a deed from her purporting to convey to him the fee simple title to the homestead. No consideration passed for this conveyance, other than the agreement on his part to execute a will of the kind hereinbefore indicated. Whether he subsequently discovered that the deed was ineffectual to pass the title of Mrs. Dodge's children and that in all reasonable probability he would become involved in litigation with them, or that, with declining years, came introspection and, after taking stock of his course in life, he decided to reconvey the property, or yet that it was prompted by other and entirely different motives and considerations, we are not called upon to speculate. This fact, however, is significant: after the institution of this suit, Mr. Miles signed the following statement written with his own hand:

"October 9 1915

"I went to work for Belle Rutledge February 1896 I worked *thair til* 1910 paid all her bills I had 9 cows 1 *yoak* of *oxon an* 1 *yoak* of *yearling* and all I got was $600 Belle never paid Stella one *sent* I made Stella a present of the cow

"W. Miles."

The deed executed by Mr. Miles reconveying the land to Mrs. Rutledge, as she then was, recites a cash consideration of six hundred dollars. Taking the statement and the deed together, we are inclined to think that Mr. Miles actually received the amount stated in the conveyance and, to this extent, profited by the transactions.

5—99 WASH.

The evidence is in sharp conflict as to the value of the homestead at the time the plaintiff signed the quitclaim deed. It appears, however, that there was a large amount of valuable timber on the land and that a considerable portion of the ranch was suitable for agricultural purposes. We shall not undertake to winnow the testimony for the purpose of definitely determining the actual worth of the property. It is plain that it possessed substantial value; that the plaintiff never derived any benefit from it and received nothing in return for her deed.

From what has been said it must necessarily follow that plaintiff is entitled to the relief sought, unless she is barred by delay in bringing her action. That there is no room in this case for the application of the doctrine of laches is manifest from our own holdings. In *Young v. Jones*, 72 Wash. 277, 130 Pac. 90, Judge Ellis, delivering the opinion of the court, said:

"The doctrine of laches as a defense is grounded on the principle of equitable estoppel, which will not permit the late assertion of a right where other persons by reason of the delay will be injured by its assertion. The case before us presents no such aspect. No right of a third party is involved. The respondents Lofgren had notice of appellants' claim almost as soon as the mistake was discovered. There is no evidence that the respondents or any one else will be placed in any worse position by a reformation because of the delay. No adverse equities have arisen in the interim. The fact of appellants' claim was at all times known to those claiming adversely. There was no evidence of fraud, deceit, or bad faith on the appellants' part. In such a case, mere delay, short of the period fixed by the statute of limitations, will not bar the action. The question is dependent upon the inherent equities of the particular case."

This statement of the principle is reaffirmed in *Bergman v. Evans*, 92 Wash. 158, 158 Pac. 961. See, also, *Ackerson v. Elliott*, 97 Wash. 31, 165 Pac. 899; *Eno v. Sanders*, 39 Wash. 238, 81 Pac. 696; *Gay v. Havermale*, 27 Wash. 390,

67 Pac. 804; *Dennis v. Northern Pac. R. Co.*, 20 Wash. 320, 55 Pac. 210.

An excellent statement of the doctrine as universally announced and applied by the courts is found in Ruling Case Law in this language:

"While statements are to be found in some of the cases intimating that unreasonable delay, and mere lapse of time, independently of any statute of limitations, constitute a defense in a court of equity, the generally accepted doctrine appears to be that laches is not like limitation a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the condition or relations of the property or the parties. Since lapse of time has a tendency to obscure evidence, and often makes it impossible to discover the truth, it is, of course, one of the elements to be considered by the court in applying laches to stale claims, but it is only one, and while important, it is not ordinarily the controlling or most important one. Hence, it has been said, laches in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. When a court sees negligence on one side and injury therefrom on the other it is a ground for denial of relief." 10 R. C. L. 396.

The doctrine finds its origin in the maxim that equity aids the vigilant, not those who slumber on their rights, and rests upon considerations of public policy. Its object is to prevent injustice and hardship, and the principle is never invoked as a mere artificial excuse for denying to a litigant that which in equity and good conscience he is fairly entitled to receive, when the assertion of the claim, though tardy, is within the time limited by statute and the rights of no one

have been prejudiced by the delay. Like most equitable doctrines it is to be applied with circumspection and as a means of administering justice. It is not to be employed as a barrier solely for the purpose of defeating meritorious claims grounded upon the plainest principles of common honesty. In the instant case, the plaintiff commenced her action within a few weeks after the discovery of the facts constituting the fraud of which she complains. There are no intervening or outstanding equities in favor of third persons. The title to the property stands where it did at the time the deed was executed. No improvements have been placed upon the land in reliance upon the conveyance sought to be cancelled. No negligence or inequity is to be imputed to the plaintiff, and no injury, in the legal contemplation of the term, will be suffered by the defendants in granting the relief prayed. Indeed, the respondents have profited by the delay. The longer the action was postponed, the more the respondents benefited by occupying the land and enjoying the profits therefrom. Not a single element of estoppel is to be found in the record, and the inherent equities of the case are all with the plaintiff. To deny relief, under these circumstances, would not be to protect a right but to inflict a penalty.

This brings us to the question of the plaintiff's right to an accounting. Taking into consideration the relation of the parties and all the facts and circumstances shown by the evidence, we are of the opinion that, as to the rental value of the land or the issues and profits derived from the use of the premises, the plaintiff should not be permitted to recover. She never, at any time, demanded an accounting on this score, but permitted her aunt to occupy the property and to use the proceeds for the benefit of herself and family. The respondents presumably have cared for the place and paid the taxes, and we think it would be inequitable to now call upon them to account for the numerous items of income received from the property covering a considerable period of time.

As to the timber, however, a different rule should apply. Its removal amounted to waste, and as the plaintiff moved seasonably in the premises, we perceive no reason why she should be denied the right of asserting her claim in this respect. The trees were a part of the realty and the plaintiff should not be deprived of any part of her inheritance.

The decree will be reversed, and the cause remanded with instructions to cancel the deed and to adjudge plaintiff her interest in the property under the statutes of descent and distribution. The court will also proceed to an accounting of the timber removed from the premises for commercial purposes and enter judgment for the plaintiff as her interest shall appear.

ELLIS, C. J., PARKER, MAIN, and FULLERTON, JJ., concur.