[No. 14951. Department Two. May 12, 1919.]

HAZEL DANIEL, *Respondent*, v. J. I. DANIEL *et al.*,
*Appellants*.[1]

PLEADING (123, 127)—SUPPLEMENTAL PLEADING—FRAUD IN SETTLEMENT. Where, pending an action, defendants procured a settlement and agreement to dismiss by fraud, the plaintiff, before entry of a dismissal, is properly given leave to file a supplemental complaint setting up the fraud and asking that the agreement to dismiss the action be set aside; under Rem. Code, § 308, authorizing supplemental pleadings to show facts occurring after the former pleadings were filed.

EQUITY (26)—COMPLETE RELIEF. Equity having jurisdiction of an action, can afford complete relief by setting aside a purported settlement of the action which was procured by fraud.

FRAUD (18, 19)—EVIDENCE—ADMISSIBILITY. To show fraud in obtaining the settlement of an action, it is permissible to show the entire transaction and the oral agreements leading up to the writings.

FRAUD (22)—EVIDENCE—SUFFICIENCY. Fraud in procuring a settlement of a daughter's action to obtain her interest in her deceased

[1]Reported in 181 Pac. 215.

mother's estate is sufficiently established where it appears that the papers were hurriedly signed without opportunity for the daughter to consult her attorney, a deed purporting to convey to her her interest in part of the property was defective, was not delivered to her, and was later falsely pretended to be lost with no offer to replace it, and a contract to pay for her schooling was not intended to be delivered, and was denied when produced, and disputed much of the defendant's testimony, and bad faith and fraudulent intent was convincingly proved by all the circumstances.

JUDGMENT (53) — FORM — SEPARATE JUDGMENT IN SUPPLEMENTAL ISSUE. Upon permitting and hearing a supplemental complaint to show fraud in procuring an agreement to dismiss the action, it is not necessary to enter a formal judgment setting aside the settlement before trying out the case; only one judgment being necessary.

EVIDENCE (88, 89)—ADMISSIONS AND DECLARATIONS—AGAINST INTEREST—DISPARAGEMENT OF TITLE. Upon an issue as to defendant's ownership of property the record title to which was in others who claimed no interest, the defendant's acts tending to show ownership and his declarations and admissions of ownership are admissible in evidence.

HUSBAND AND WIFE (52)—COMMUNITY PROPERTY—PROPERTY PURCHASED. The purchase of property by a husband with deed and title taken in the name of another does not create a trust relation between husband and wife, but the property becomes their community property.

ADVERSE POSSESSION (10)—LIMITATION OF ACTIONS (10)—REAL PROPERTY—OPEN AND NOTORIOUS POSSESSION. Where the beneficial owner of property, standing in the name of another, did not record his deed and kept his interest concealed, his possession was not open and notorious within the meaning of the statute of limitations (Rem. Code, § 786) respecting the recovery of real property possessed by actual, open and notorious possession for seven consecutive years.

APPEAL (389)—AMENDMENTS REGARDED AS MADE. In an equitable action tried de novo on appeal a defective complaint that is amendable will be considered as amended.

TENANCY IN COMMON (7, 11-1)—MUTUAL RIGHTS—RENTS. Where property of tenants in common was productive when acquired, and had been withheld from a cotenant under an adverse claim, so that a demand for a share of the income would have been unavailing, such cotenant is entitled to an accounting for her share of the profits.

VENUE (1, 3)—REAL PROPERTY IN ANOTHER STATE. An action by a tenant in common to recover an interest in land in possession of

her cotenant holding adversely involves the title and right of pos-
session, and must be tried in the state in which the property is
situated.

HUSBAND AND WIFE (98) — COMMUNITY PROPERTY — RIGHTS OF
HEIRS.   Since there can be no accounting between husband and
wife as to community property before dissolution of the com-
munity, a child, excluded from her interest in her deceased mother's
estate, is not entitled to an accounting for profits prior to her
mother's death.

TENANCY IN COMMON (9)—MORTGAGES—BY ONE TENANT.   A mort-
gage by one tenant in common holding the legal title is a lien only
upon his interest, as between him and his cotenant.

Cross-appeals from a judgment of the superior
court for Spokane county, Blake, J., entered January
25, 1918, upon findings in favor of the plaintiff, in an
action to quiet title and for an accounting, tried to the
court.   Affirmed.

*Cyrus Happy* and *O. C. Moore,* for appellants.

*George W. Belt* and *Fred M. Williams,* for respond-
ent.

FULLERTON, J.—This action was instituted by Hazel
Daniel as plaintiff against the defendants, John I.
Daniel and Ella Mona Daniel, his wife, to have estab-
lished and set aside to her an interest in certain de-
scribed real property, situated in part in the state of
Washington and in part in the state of Arizona.   The
plaintiff claims as heir of her deceased mother, for-
merly the wife of the defendant John I. Daniel, who
is her father.   The other defendant is the present wife
of John I. Daniel.   In the complaint it is alleged that
certain of the property in the state of Washington,
namely, lot 2, of block 10, Resurvey and Addition to
the city of Spokane, was the property of the com-
munity consisting of the defendant John I. Daniel and
the plaintiff's mother, owned and held by them at the

time of the mother's death; and that the other property in this state was acquired by the defendant subsequent to the mother's death from the rents, issues, and profits of the community property. The property in Arizona was in part entered as a homestead under the laws of the United States during the lifetime of the mother, and commuted subsequent to the mother's death. The remainder of the property in that state was subsequently purchased by the defendant John I. Daniel with the proceeds, it is alleged, of the community property mentioned.

The answer of the defendants put in issue the allegations of the complaint concerning the manner and time of the acquisition of the property, and affirmatively averred that the property was acquired subsequent to the death of the plaintiff's mother, and that it was the separate property of the defendant John I. Daniel. In the answer, the statute of limitations was also pleaded. To the answer, a reply was filed, putting in issue its affirmative allegations.

With the issues thus framed, and before a trial was entered upon, the plaintiff and defendants purported to settle the differences between them. The written evidences of the purported settlement consisted of some five separate instruments: (1) A writing signed by the plaintiff, entitled after the manner of the pleadings, in which, after reciting that since the commencement of her action, she had become convinced that it was without merit and that she had been misled in starting the same, she consented to its dismissal; further agreeing that the dismissal should "be *res adjudicata*" of any further cause of action, and that she would not thereafter directly or indirectly prosecute any further suit for the recovery of the property, and that the writing should be sufficient authority for the

court to make an order dismissing the action; (2) a quitclaim deed, signed and acknowledged by the plaintiff, purporting to convey to the defendant her interest in all of the property described in the complaint situated in the state of Washington; (3) a quitclaim deed, signed and acknowledged by the plaintiff, purporting to convey to the defendant all her interests in the property described in the complaint situated in the state of Arizona; (4) a writing on a printed blank form for a quitclaim deed, signed by the defendants, but otherwise defectively executed, purporting to convey to the plaintiff forty acres of the homestead property, situated in the state of Arizona; and (5) an agreement signed by the defendant John I. Daniel in which he agreed to pay the plaintiff's schooling, board, laundry, room rent, buy her clothing, give her ten dollars per month spending money, for a term of "one year but not more than two," while she was in attendance upon some school not named. The writing authorizing the dismissal of the action was filed in the cause on November 16, 1916, some three months after the filing of the reply.

The action was not dismissed on the agreement, and later on the respondent obtained leave of court and filed a supplemental complaint. In this complaint, she charged the defendants with fraud in procuring the writing authorizing a dismissal, setting forth in detail the facts upon which the charge was founded and asking that the agreement to dismiss and the quitclaim deeds executed by her be set aside and held for naught. To this complaint, the defendants demurred, and on their demurrer being overruled, answered, putting in issue its allegations.

The cause was then tried upon the issues made by the supplemental complaint and the denials thereto,

at the conclusion of which the trial court announced that the allegations of the complaint had been sustained and that he would, in the final judgment, should the allegations of the principal complaint be sustained, set aside and hold for naught the agreement to dismiss and the quitclaim deeds issued contemporaneously therewith. To these conclusions, the defendants excepted, and moved that the court's findings be reduced to writing and that a judgment be then entered embodying the court's holding, that an appeal therefrom might be taken and perfected. This motion the court denied; whereupon the trial proceeded upon the issues made by the original complaint, the answer thereto, and the reply to the answer. At the conclusion of the trial, the court entered a decree setting aside the written agreement for a dismissal of the action, the quitclaim deed from the plaintiff to the defendant John I. Daniel for the property in the state of Washington, decreeing the plaintiff to be the owner of an undivided one-twelfth interest in the lot hereinbefore specifically described, and directing that an accounting be taken for a one-twelfth interest in the rents and profits of the property received by the defendant John I. Daniel since the death of the plaintiff's mother. It was further decreed that the plaintiff had no interest in the other property described in the complaint situated in the state of Washington. While the decree made no specific reference to the Arizona lands, the court early in the trial held that it was without jurisdiction over them and admitted evidence only as tending to elucidate the respective contentions of the parties. Both parties appeal.

Taking up the appeal of the defendants, the first question to be noticed arises on the ruling of the court permitting the appellant to file the supplemental com-

plaint. It is claimed that this was error because the matter set forth therein was not in aid of the cause of action pleaded in the original complaint; that is, it did not bring before the court new matter pertaining to the cause of action originally set forth arising subsequent thereto, but was a matter independent of the original cause of action, tending to defeat it, and hence must be itself the subject of an original cause of action. But, conceding the effect of the matter set forth in the complaint to be as the defendants contend, we think, nevertheless, there was no error in permitting it to be filed in and tried out as a part of the original action. If a controversy had arisen between the parties over the ownership of the land, and a purported settlement had been agreed upon between them before action was begun thereon in which the defendants had overreached and defrauded the plaintiff, manifestly the plaintiff could, in a single suit in equity, set aside the purported settlement and establish her interest in the property. She would not have been compelled to institute two suits for that purpose. Equity, having jurisdiction over the controversy, could in one proceeding afford complete relief. The fact that the purported settlement was had in the instant case after suit begun does not change the situation in this respect. The plaintiff must, of course, set aside the settlement before she can proceed with the main action, but she would have had to do this in the case supposed. Since, therefore, the original action in the case before us was not actually dismissed, and since the settlement was made subsequent to the commencement of the original action, no reason exists why it cannot be brought before the court in a supplemental complaint. More than this, the statute (Rem. Code, § 308) expressly provides that the court may,

on motion, allow supplemental pleadings, showing facts which occurred after the former pleadings were filed; and we think one of the purposes of the pleadings therein provided for is to permit questions such as are here presented to be tried out in the original action. True, this court in common with other courts, has held that a premature action cannot be ripened into an existing cause of action by a supplemental complaint showing facts arising after the commencement of the action (*Keeler v. Parks,* 72 Wash. 255, 130 Pac. 111); but this is not the condition presented here. The complaint in this instance stated a valid cause of action. By an agreement made afterwards the action was apparently destroyed. Clearly it violates no principle of the case cited to show by a supplemental complaint that the agreement was procured by fraud.

Another contention under this head is that the court erred in permitting the plaintiff to show the entire transaction with reference to the purported settlement, the oral agreement leading up to the writings as well as the entirety of the writings; the contention being that the testimony should have been confined to the single instrument authorizing the dismissal of the action. But this is not the rule. The charge was fraud in procuring the agreement. To establish this, the appellant was permitted, under the well established rule, to show the entire transaction. *Gordon v. Hillman,* 91 Wash. 490, 158 Pac. 96.

A third contention is that the evidence does not justify the conclusion that the settlement was induced by fraud. We do not feel inclined to discuss this phase of the case at any length, yet there are certain salient features concerning it, either undisputed or clearly proved, which may be mentioned. The settlement contemplated that the plaintiff should be permitted to

attend a school in California. The papers were not presented to her for signature until the afternoon of the day her departure for that state was arranged for. The papers were executed in the office of the brother of the defendant John I. Daniel, the brother officiating as notary. The plaintiff alone represented her side of the controversy, and when she suggested showing the papers presented for signature to her attorney, was dissuaded from so doing. The only ones of the instruments that are drawn with technical skill are the instruments passing from the plaintiff to the defendants. The agreement to dismiss is in technical language, and the deeds executed by the plaintiff are carefully drawn and regularly executed. The instruments delivered to the plaintiff were prepared either by the defendant John I. Daniel or by him with the aid of his brother. In the purported deed to her of the land in Arizona, all of the words of grant are carefully erased, a condition is inserted in it which would render it nugatory as a deed even were it sufficient otherwise, and the notary neglected to authenticate the acknowledgment with his official seal, although no such oversight occurred in the execution of any of the other instruments. The body of the instrument and the body of the acknowledgment bear a date later than the day it was actually executed. The plaintiff was not permitted to retain the deed, but it was carried to Arizona, either by the defendant John I. Daniel or by a brother of the plaintiff ostensibly to be recorded. After reaching Arizona, the defendant wrote a letter to his codefendant in which he told her to tell the plaintiff that,

"We have lost our roll of bedding and many other things on the said desert and the quitclaim deed of hers tell her it was no good any way as unkle Geo. forgot to put his seal on it, and also the year was left

out and there was no money consideration so the loss to her was nothing . . ., be sure and tell her all these things as we had rather you would than to say anything to her.''

The part of the letter containing these words was sent by the codefendant to the plaintiff, and afterwards the plaintiff brought the matter to her father's attention. But neither then nor at any time did he make, or offer to make, a new conveyance to take its place. Subsequent events developed that the instrument was not lost, as it was afterwards put into the evidence from the defendant's possession. True, he explains that it was carried by a brother of the plaintiff, who mislaid it and reported it as lost. This, however, but hooks him with another horn of the dilemma— it shows, if true, that he knew, at the time of its execution, of its defects, and that he did not then see fit to have the defects corrected. In this connection, it may be mentioned that the quitclaim deed from the plaintiff to the defendant described as part of the land conveyed the forty-acre tract which the defendant purported to convey to the plaintiff by this instrument. The evidence makes it clear, also, that the contract with reference to the schooling was not intended for delivery. The evident surprise of the defendant John I. Daniel, when he found that the plaintiff had possession of it, is too obvious to be overlooked, and to overcome its effect he denied that it bore his signature. He was compelled to admit, however, that the body of the writing, with the exception of the concluding sentence, was in his handwriting and that it was one of the instruments prepared in contemplation of settlement, his evidence being that another instrument more specific in its terms was actually delivered. The plaintiff testified that the instrument was written out and signed by her father, and

that the disputed line was put in by him after she had read it over and suggested that no definite time during which she might attend school was fixed, and that no other or different instrument was given her. The instrument is a part of the evidence, and its perusal leaves no doubt as to the genuineness of the signature, nor does it leave in doubt the truthfulness of the plaintiff's testimony as to the added line. The necessity for questioning its genuineness is made clear when it is understood that it disputes much of the oral testimony given by defendant concerning this part of the transaction.

The conduct of the parties subsequent to the execution of the instrument is gone into in much detail. This we shall not review. On the whole, the evidence is convincing that the defendants did not act in good faith with the plaintiff, but intended to procure such interests as she had in the property without giving her the actual benefits she was led by them to believe she would receive as a consideration for her interests.

But the defendants contend that, taking the plaintiff's version of the transaction at its full worth, nothing more is shown than the execution of a contract and its subsequent breach, and that this does not establish a preconceived intention not to perform. But while we freely concede that the conclusion here drawn correctly follows the premise as stated, we cannot concede that the evidence bears the construction put upon it. To our minds, the evidence is convincing, if not conclusive, that the defendants never intended an honest settlement; that they not only did not intend to carry out the purported agreement, but that they did not intend that the plaintiff should have or retain the written evidences of the settlement purported to be executed in her favor. This is fraud, vitiating the

settlement, not a mere breach of a contract of settlement.

"We have no doubt that the weight of authority sustains the appellant's contention that, if the promise is made merely as a means of deceiving and with no intention to perform, it constitutes such fraud as will support an action for deceit and entitle the injured party to a rescission." *Hewett v. Dole*, 69 Wash. 163, 124 Pac. 374.

There was no error in refusing to enter a formal judgment at the conclusion of this part of the hearing so that an appeal could be taken therefrom. There was but one action, and one judgment is all that was necessary.

Having reached the conclusion that the plaintiff is not estopped to maintain her action by the attempted settlement, we pass to the question of her interest in the property. To an understanding of this branch of the controversy, a further statement of the facts is necessary. The property in this state, asserted to have been formerly the community property of John I. Daniel and the plaintiff's mother, was formerly the property of one Cyrus Happy. In September, 1899, Mr. Happy leased the property to one Jay Daniel, a brother of the defendant John I. Daniel, for a term of three years, with the privilege of renewal for a like period. At that time the lot was vacant and the lease granted the lessee the privilege of constructing a building on the lot. The lease was not placed of record. Shortly after the execution of the lease, a building was erected on the lot, the contract therefor being let by the lessee to a firm of builders. In November, 1900, the lessor and a real estate broker approached Mr. Happy with a proposition to purchase the lot. The terms offered were satisfactory, and at their request he deeded the property to one Charles

Crosby, the consideration being paid by the check of the broker. Mr. Happy had no negotiations with Crosby, and does not remember of having met him until after the commencement of the present action. Crosby placed a mortgage on the property after obtaining the deed, both instruments being filed for record at the same time by the broker. Crosby held the legal title to the property until January 18, 1904, when he deeded it to Rolland B. Reed. Reed deeded the property to J. H. Ross on March 10, 1904, and he in turn deeded it to the defendant by a deed dated May 17, 1907, which was recorded on November 26, 1909. While Ross held the legal title, he placed a number of mortgages upon it, and these instruments, together with the deeds mentioned, are the only recorded instruments which affected the title to the property since its acquisition from Happy. In addition to these instruments, however, a number of unrecorded instruments pertaining to the title were introduced in evidence; (1) an agreement dated March 11, 1904, entered into between Jay Daniel and John I. Daniel in which it is recited that the property is the property of Jay Daniel, and in which he agreed to sell and does sell to John I. Daniel an undivided half interest in the property for a stated consideration, a part to be paid in cash and the balance in installments; the agreement further provides that J. H. Ross shall act as trustee for both parties, that John I. Daniel shall have the management of the property, that J. H. Ross shall execute a deed to a one-half interest in the property to John I. Daniel, which shall be attached to the agreement and placed in escrow with G. P. Daniel "and to be delivered upon request of both parties present"; (2) a deed dated March 11, 1904, from J. H. Ross to John I. Daniel for an undivided half interest in the

property; (3) a deed dated April 10, 1906, from J. H. Ross to Jay Daniel for an undivided one-half interest in the property; and (4) a power of attorney dated March 11, 1904, from J. H. Ross to John I. Daniel, empowering Daniel to lease the property mentioned, collect the rents and to transact all business pertaining thereto. It is conceded, or if not conceded overwhelmingly proven, that neither the broker who paid the purchase price for the property to Happy, Crosby, to whom the property was then deeded, Reed, who received title from Crosby, or Ross, the grantee of Reed, ever had any interest in the property. The broker was the person who negotiated the loan by which the purchase price was procured, and Crosby and Ross were related by marriage to the Daniel brothers. Of Reed, nothing is shown further than that he appeared before G. P. Daniel at the time of the execution of his deed to Ross.

It is the plaintiff's contention that John I. Daniel has had, at all times since the acquisition of the lease from Happy, an interest in the property; that this interest was a half interest up to the time he received a conveyance of the full legal title from Ross in 1907, and from thence on, the entire interest. It is the defendant's contention that the defendant John I. Daniel first acquired an interest in the property on March 11, 1904, by purchase from Jay Daniel, evidenced by the written agreement entered into between them bearing that date.

In support of her contention, the plaintiff relies, in addition to the record chain of title from Happy to John I. Daniel and the concession that the intermediary title holders had no beneficial interest in it, upon acts and declarations of John I. Daniel concerning the property prior to his acquisition of the legal title. The

testimony intended to connect the defendant with the title was, in brief, this:

First, that of O. R. Stockwell. This witness testified that, when the lease from Happy was in contemplation, opposition was met from another brother who owned a lot in the block in which the property was situated and who desired the property himself; that Jay Daniel and John I. Daniel together approached the witness and requested that he see the other brother and endeavor to have him withdraw his opposition.

Second, that of the witness Hastie. This witness testified that he was one of the contractors who constructed the building after its lease to Jay Daniel; that, during the course of the work, John I. Daniel was around the building overseeing the construction work; that he directed such alterations to be made in the manner of construction as were made and that he went with the witness to a neighboring village to purchase lumber, explaining his acts by saying he had an interest in the property, was putting up most of the money and desired to get it as cheaply as possible.

Third, that of James R. Congleton, from whom the lumber was purchased. This witness could not recall the circumstance attending the purchase of the lumber, but testified that, after a portion of it had been delivered, a complaint was made concerning the character or quality of the lumber purchased and that he visited the building then in the course of construction and adjusted the difficulty with the defendant John I. Daniel.

Fourth, that of James Cleveland. This witness testified that, at the time the building was being constructed, he operated a hotel on a lot adjacent to the

building, that he repeatedly saw the defendant about the premises, that he had a conversation with him concerning the sewer connections with the building, that the building as then constructed did not cover the entire lot, and that the defendant endeavored to sell him the uncovered portion.

Fifth, that of Claudia St. Vitieux and her husband, who testified to leasing a portion of the building from and paying rent to the defendant John I. Daniel.

Sixth, that of J. H. Ross and his wife, who testified to declarations made by John I. Daniel, indicating ownership in him of an interest in the property from the time of the execution of the lease by Happy.

Seventh, that of the plaintiff herself, who testified to statements made by her father to the effect that she had money coming to her from her mother's estate.

In addition to the foregoing, there were acts and circumstances shown which we shall not detail, consistent with ownership, but perhaps not inconsistent with some other or different relation.

The foregoing testimony went into the record in the court below over the objection of the defendants, and in this court they urgently insist that it was inadmissible. It is argued, first, that "It is an attempt to establish an interest in land in derogation of the written title, and in violation of the fundamental rule against the varying of written instruments by oral testimony." But, we cannot believe the evidence open to these objections. Subsequent to the deed from Happy to Crosby, and prior to the time the defendant Daniel acquired the legal title, the holders of the legal title were not the actual owners of the property. They held it in trust for another or for others, and who that other was or who those others were is the principal issue in the present controversy. If the defend-

ant, now asserting the contrary, was such actual owner, the plaintiff has an interest in the property; if he was not such actual owner, she has no interest. Plainly, on an issue between the plaintiff and the defendant as to the ownership of the property, the defendant's acts tending to show ownership on his part and his declarations and admissions of ownership are admissible. Nor is it material that the acts occurred or the admissions were made prior to the time the controversy between the parties arose. They were made at the time when ownership is sought to be shown and,

"In a civil action the admissions by a party of any fact material to the issue are always competent evidence against him, wherever, whenever or to whomsoever made." *Reed v. McCord*, 160 N. Y. 330, 54 N. E. 737.

Nor is it merely impeaching evidence to be introduced in contradiction of the testimony of a party to the record; on the contrary, it is independent, substantive evidence tending to prove the issue, and may be given by a party as part of his evidence in chief. *Hart v. Pratt*, 19 Wash. 560, 53 Pac. 711. Nor was there here a trust relation between the defendant and the plaintiff's ancestor. Their relation arose from the operation of law—the community property law—and if John I. Daniel, prior to his wife's death, procured a beneficial interest in the property, the interest was community property which the plaintiff could inherit. Hence the evidence in no way tended to establish a trust relation, much less an express trust, which cannot be established by parol.

Another contention is that the action is barred by the statute of limitations. This contention is founded on the provisions of § 786 of the code (Remington's),

which provides that all actions brought for the recovery of real property of which any person may be possessed by actual, open and notorious possession for seven successive years, having a connected title deducible of record from the United States, shall be brought within seven years next after such possession is taken. But it will be remembered that the defendant first came into open and notorious possession of the property when the deed from Ross to him was recorded on November 26, 1909. Prior to that time, he kept his interests concealed, dealing with the land through others who were the ostensible and record owners. The possession such as he exercised prior to the record of the deed was not so open and notorious as to start the running of the statute. The action was commenced well within the seven-year period after the deed was recorded and in consequence is not barred by the statute cited.

Other contentions are that the complaint does not state and the proofs do not establish a cause of action. As to the complaint, little need be said. Conceding that it is defective, the concession is not fatal to the plaintiff's right of recovery. The defects were amendable, and we are admonished by the statute to treat all amendments which could have been made, as actually made. The rule is especially applicable to cases of this sort which are tried in this court *de novo*.

As to the sufficiency of the evidence, we are not disposed to disturb the findings of the trial court. The strongest proofs on the defendant's behalf is, perhaps, the written instruments between the defendant John I. Daniel and his brother Jay, wherein the defendant purported to acquire his first interest in the property. This instrument bears a date subsequent to the death of the plaintiff's mother, and if it is

genuine, conclusively establishes that the plaintiff has no interest in the property. But the trial court concluded that this was only another *indicia* of the defendant's fraud; that it was not what it purported to be, but was executed for evidentiary purposes—possibly to show want of necessity for administration upon his wife's estate. It is significant that, on this. question, Jay Daniel, the other party to the instrument, was not called as a witness, although the record shows him to have been within the reach of the process of the trial court. But we think it unnecessary to discuss the evidence further. Taking it as a whole, and giving full effect to the defendant's denial and his very plausible version of the evidence militating against him, we cannot say that the evidence does not preponderate in favor of the plaintiff.

The concluding contention is that the court erred in adjudging the plaintiff entitled to an accounting of the rents, issues, and profits of the property subsequent to the death of the mother. Cases are cited from this court where such accountings have been denied. But whether an accounting will or will not be allowed depends upon the facts of the particular case. Where one tenant in common enters upon the common estate which in its then condition yields no profit, and so improves it as to make it productive, he is entitled to all of the profits produced by means of his improvements. *Leake v. Hayes,* 13 Wash. 213, 43 Pac. 48, 52 Am. St. 34. And also when the profits are the result of the individual labors of the tenant in possession, and no demand for an accounting has been made, an accounting will not be decreed. *Crodle v. Dodge,* 99 Wash. 121, 168 Pac. 986. But the general rule is to the contrary, the instances where an accounting is refused being exceptions to and not

expressive of the general rule. *Eckert v. Schmitt,* 60 Wash. 23, 110 Pac. 635; *Schuster v. Schuster,* 84 Neb. 98, 120 N. W. 948, 29 L. R. A. (N. S.) 224; 18 Ann. Cas. 1078, and notes.

In this case, we think the court rightly decreed an accounting. The property was productive at the time the plaintiff's interest was acquired. It has been withheld from her under an adverse claim. At no time would a demand for her share of the income have availed her anything, and furthermore, the tenant in possession occupied towards her a fiduciary relation. The case is thus within the rule, not an exception to the rule.

The decree, as entered by the trial court, decrees the plaintiff to be the owner of an undivided one-twelfth interest in and to the property thereinbefore specifically described, and to be entitled to an accounting for one-twelfth of the rents, issues and profits thereof, received by the defendant J. I. Daniel since the death of the plaintiff's mother on December 14, 1903. It further decrees that, in such accounting, it be ascertained what mortgages existed on the property at the death of the mother and that now exist on the property placed thereon subsequent to the death of the mother,

"and that it likewise be ascertained what use and disposition was made by defendant J. I. Daniel of the funds received from any such mortgage so found to exist against such property, and that to the extent of any part of the money so received, if any, that may have been used or diverted to some purpose other than the payment of valid mortgage lien or liens and the improvement or maintenance or to the payment of taxes and assessments against said property, the plaintiff be and is hereby given a lien on the undivided eleven-twelfths of said property owned by the

defendants, in proportion as plaintiff's interest therein may be affected by such existing lien.''

It was further decreed that the plaintiff has no interest in the other property described in the complaint, and the defendants were decreed to be the owners of such property, free and clear of any claim of the plaintiff.

The court refused the request of the plaintiff to decree with reference to the land in the state of Arizona, and refused to direct an accounting of the profits of the land awarded to the plaintiff prior to the death of her ancestor.

The plaintiff's appeal questions certain of these rulings, the first of which is the refusal to decree with respect to the Arizona land, but there was no error in this respect. The plaintiff's interest in the land, if any she has, is that of a tenant in common with the defendant. She has no record title. No question of trust is involved. The defendant is in possession asserting absolute title in himself. The question involved, therefore, is title and right of possession in plaintiff, and the rule is fundamental that title and right of possession to real property must be tried in the state where the land is situated. The trial court rightly determined that it was without jurisdiction. *Olympia Mining & Milling Co. v. Kerns,* 64 Wash. 545, 117 Pac. 260; *Lindsley v. Union Silver Star Mining Co.,* 26 Wash. 301, 66 Pac. 382; 15 C. J. 742.

A second contention is that the plaintiff is entitled to an accounting of the rents, issues and profits of the property accruing prior to her mother's death. But we think the contention unfounded. The plaintiff took her interest in the property as the heir of her mother; that is, such an interest as her mother had and no other. Her mother's interest was a community inter-

est and between members of the community there can be no accounting, at least, until after its dissolution by divorce or some other method authorized by law. Death, however, is not such a method, and since the mother had no right to an accounting for these profits, her heirs could acquire none by inheritance. The plaintiff's learned counsel, to sustain the contention, assert the principles involved in trust estates, but clearly, there was here no trust of any sort. On the death of the mother the defendant John I. Daniel and the plaintiff became tenants in common of the property. When, therefore, Daniel took possession of the property, he became a tenant in common in possession, and the plaintiff's rights are such and such only as pertain to such a situation. She has the right to recover her interest from the cotenant in possession, and the right to recover her proportionate share of the profits accruing during the possession which have been taken and appropriated by the tenant in possession. The profits were not trust funds to be followed into other property.

Some question is made concerning the provisions of the decree in relation to the existing mortgages upon the property. As to the validity of these mortgages between the mortgagee and the appellant, the question, of course, is not here for determination. As between the plaintiff and the defendants, it is equally clear that they are liens only upon the defendant's interests. The decree, as we understand it, does nothing more than recognize these principles and we see no necessity for directing its modification in that respect.

The decree is affirmed.

MAIN, MOUNT, HOLCOMB, and PARKER, JJ., concur.