[No. 6599. Decided April 12, 1907.]

A. B. STEWART *et al., Respondents,* v. YESLER ESTATE, Incorporated, *Appellant.*[1]

SPECIFIC PERFORMANCE — LACHES — EVIDENCE—SUFFICIENCY. Specific performance of a contract for an interest in lands will be denied on account of inexcusable laches, where the plaintiff and associates, in 1888, agreed to advance the cost of clearing, platting, and selling the land and paying the taxes thereon, the plaintiff to have a one-sixth interest on the returns from sales, after paying a stated sum to the owner and repayment of disbursements, but plaintiff and his associates failed to perform any part of the agreement during a long period of financial depression, allowing the lands to be sold to the defendant for taxes, in the interest of creditors of the estate of the owner, who carried the same, and where plaintiff only commenced action in 1905, when the land had increased tenfold in value, four years after notice that defendant denied his interest in the property.

Appeal from a judgment of the superior court for King county, Griffin, J., entered November 19, 1906, upon findings in favor of the plaintiffs, after a trial on the merits before

[1]Reported in 89 Pac. 705.

the court without a jury, in an action for the specific performance of a trust agreement.    Reversed.

*Harold Preston* and *Hughes, McMicken, Dovell & Ramsey,* for appellant.

*Charles F. Munday* and *Peters & Powell,* for respondents.

Crow, J.—Action by A. B. Stewart and wife against the Yesler Estate, Incorporated, to enforce specific performance of an alleged trust.    The following facts are undisputed: Early in 1888, Henry Yesler, owning twenty acres of unplatted land in Seattle,. and block 1 (containing twenty-four lots) in Sarah B. Yesler's First Addition to Seattle, entered into a written agreement, as first party, with L. S. J. Hunt, J. F. McNaught, J. D. Lowman, and A. B. Stewart, as second parties, stipulating that upon their request he would plat the twenty acres and sell the same and block 1 to purchasers procured by them, at not less than $500 per acre for the twenty acres, and $225 per lot for block 1; that all disbursements for platting, clearing, grading and improving and all taxes were to be advanced by the second parties; that Yesler was to first receive $15,400, of the proceeds of sales made.; that the second parties were then to be reimbursed for their advancements, and that the remainder was to be paid, one-third to Yesler and one-sixth to each of the second parties. This agreement was destroyed in the great Seattle fire in 1889.

Henry Yesler died December 16, 1892.    On December 15, 1892, he being then alive but on his death bed, J. D. Lowman, acting as Yesler's attorney in fact, under a power of attorney held by him, executed and delivered to Jacob Furth a deed for the real estate above mentioned.    On December 16, 1892, but after Yesler's death, Furth executed and delivered the following instrument:

"Whereas Henry L. Yesler, by the hand of James D. Lowman, his attorney in fact, did, on the 15th day of December,

17—46 WASH.

1892, convey to me, Jacob Furth, these certain premises situated in the County of King, State of Washington, and particularly described as follows, to wit: [Here follows description.] And whereas said conveyance was made to me upon certain confidences and trusts (I myself having no interest in the said lands, and taking nothing for myself by the said conveyances), to wit: I am to plat the said twenty acres whenever requested so to do by L. S. J. Hunt, A. B. Stewart, Joseph F. McNaught and J. D. Lowman, and to sell to such purchasers as they or either of them may procure therefor, at such prices as they may dictate: *Provided, however,* That no lot in said block one (1) may be sold for less than $225.00 per lot, nor any part of the said twenty (20) acres at a less rate than $500.00 per acre. All expenses for the clearing, platting, grading or any improving of said property or any part thereof is to be paid and advanced by them, the said Hunt, Stewart, McNaught and Lowman, who are also to pay all taxes, city and county upon said property and the whole thereof, . . . I am to receive all moneys paid by purchasers for lots or parts of said lands, and am to pay all of the same to Henry L. Yesler, his heirs, executors, administrators or assigns, until he, the said Henry L. Yesler, shall have been paid the sum of $15,400.00. After the said sum of $15,400.00 shall have been paid to the said Henry L. Yesler, his heirs, executors, administrators or assigns, I am, out of any further moneys received from such sales, to repay any and all advancements made by the said Hunt, Stewart, McNaught and Lowman, or either of them, for clearing, platting, grading or otherwise improving the said lots or lands or in paying the taxes thereon. After the said payment of $15,400.00 shall have been made to the said Henry L. Yesler, his heirs, executors, administrators or assigns, and after said advancements, if any, have, as above provided, been paid the said Hunt, Stewart, McNaught and Lowman, or either of them, I am to divide all further moneys received by me from such sales, into five parts, as follows, to wit: . . ."

The agreement then provides for the payment of one-third of the residue to Yesler and one-sixth each to Hunt, McNaught, Lowman and Stewart. In November, 1894, a

supplementary declaration of trust was executed, reading as follows:

"This indenture entered into this —— day of November, A. D. 1894 between Jacob Furth of the first part, and L. S. J. Hunt and Jessie N. Hunt, his wife, A. B. Stewart and May Stewart, his wife, Joseph F. McNaught and Jennie E. McNaught, his wife, J. D. Lowman and Mary R. Lowman, his wife, of the other part,   Witnesseth: That, whereas, by deed bearing date December 15th, 1892, Henry L. Yesler did convey to the party of the first part [here follows description of land above mentioned.]   And whereas, the said conveyance was made to me in trust upon the confidences and trusts embraced and expressed in a certain declaration of trust executed by the party of the first part under his hand and seal on the 16th day of December, 1892, which declaration of trust was delivered to L. S. J. Hunt, A. B. Stewart, Joseph McNaught, J. D. Lowman and Henry L. Yesler on the day of its date; and which declaration of trust is hereto attached and made a part hereof.   And whereas, Henry L. Yesler, J. D. Lowman, J. F. McNaught and L. S. J. Hunt did on the 10th day of January, 1892, make and deliver to The James Street Construction Company their promissory note for the sum of twenty-five hundred dollars ($2,500) with interest thereon from June 16th, 1891, until paid at the rate of eight per cent per annum, and on the 10th day of July, 1892, did make and deliver to the said payee their other promissory note of twenty-five hundred dollars ($2,500) bearing date July 10th, 1892, payable one year after date with interest from June 16th, 1892, until paid at the rate of eight per cent per annum, which said promissory notes are now held by M. H. Young, and have been presented to the administrators of the estate of Henry L. Yesler, deceased, as a claim against the said estate.   And whereas, said notes were given by the makers, thereof as a subsidy to the James Street Construction Company, for the Broadway branch of the Union Trunk line.   And, whereas, since the execution of said deed and declaration of trust, the north half of said block one (1) has been sold for the sum of four thousand dollars ($4,000.00) and said sum paid to the estate of Henry L. Yesler upon the payment of fifteen thousand four hundred dollars ($15,400.00) due him under said declaration of trust;

"And, whereas, it was agreed between the makers of said notes at the time of their execution, that the makers of said notes as between themselves should be liable as follows: Henry L. Yesler, one-third (1-3) thereof, J. D. Lowman, two-ninths (2-9) thereof, Joseph F. McNaught, two-ninths (2-9) thereof, L. S. J. Hunt, two-ninths (2-9) thereof, and that each should be surety for the others for their payment of their share of said notes; and further, that the said notes should be paid out of the proceeds of the property so as aforesaid conveyed, as follows: 1st. Henry L. Yesler should be paid in full his fifteen thousand and four hundred dollars ($15,-400.00) as in said declaration of trust provided. 2nd. A. B. Stewart, should be paid one-sixth (1-6) of the net balance, as in said declaration of trust provided (any advancement or advancements made by either party in the interest to be first deducted.) 3rd. The net balance of such proceeds after deducting the said payment to Henry L. Yesler of $15,400.00 and the said payment to A. B. Stewart, of his one-sixth (1-6) as above provided, and after the payment of advances made as provided in said declaration of trust, was to be applied, first to the payment of said notes or of the amount thereof to any maker or makers thereof who should in the meantime have been compelled to pay the said notes, and after that the balance remaining to be divided into five (5) parts to be paid as follows: One-third (1-3) to Henry L. Yesler; two-ninths (2-9) to L. S. J. Hunt; two-ninths (2-9) to Joseph F. McNaught, and two-ninths (2-9) to J. D. Lowman; And whereas, in preparing the said declaration of trust the fact that said notes were outstanding was overlooked, and therefore it was neglected to provide for them in said declaration of trust;

"Now, therefore the said declaration of trust is modified as hereinafore said so as to express the true understanding and agreement of the parties as above stated, and that the parties in interest do hereby agree to such modification."

This instrument was executed by all the parties thereto, including the plaintiff Stewart.

At no time prior to the commencement of this action did Stewart or his associates clear, plat, grade, or improve the land or pay taxes. The taxes became delinquent and certificates of delinquency were issued. Between 1892 and 1898,

a period of general financial depression prevailed in this state. Jacob Furth and Minnie G. Yesler were appointed administrator and administratrix of Yesler's estate, which was heavily involved. In 1898 they sold all his realty including that above mentioned, under order of the probate court. The unsecured creditors selected one Rolland B. Denny to purchase the property. He made the purchase on June 27, 1898, holding in trust for such creditors, and thereafter the defendant corporation, the Yesler Estate, Incorporated, being formed, he, at the creditor's request, conveyed all the real estate to it, receiving its capital stock in payment. This stock was distributed to the creditors. The Stewart & Holmes Drug Company, being a creditor, its stock was received by A. B. Stewart as its president. The subsidy notes were presented as claims against the estate of Henry Yesler, and their holder having received stock transferred them to the Yesler Estate, Incorporated, which, in October, 1898, entered into agreements with Hunt, McNaught and Lowman, releasing them from liability under the trust agreement, and the notes. Thereupon Hunt and Lowman released to the defendant their interest in the real estate. As numerous judgments stood against McNaught, the defendant, with his consent, foreclosed against him and purchased his interest at sheriff's sale. These steps were taken to remove any possible cloud on defendant's title, and immediately thereafter it redeemed the property from the delinquent tax sales, disbursing $4,000 therefor. It has paid further taxes and assessments sufficient to make a total of $13,517.40.

On December 9, 1901, Mr. Furth wrote Stewart that the defendant, claiming Stewart had no interest in the property, had demanded a deed from Furth, and stated that he would delay action for fifteen days until Stewart could consider his course of procedure. On December 11, 1901, Stewart wrote Furth, claiming a one-sixth interest in the real estate, and stated that he was ready and willing to, pay one-sixth of the taxes, upon being furnished a statement. About the same

time he made a like offer to the defendant.  On December 24, 1901, the defendant wrote Stewart denying his claim, giving a detailed statement of the situation as understood by it, and closed by saying: "We do not understand that you have any interest in this property."  On December 31, 1901, Mr. Furth wrote Stewart that he would convey the property, and shortly thereafter did so by a quitclaim deed to the defendant.  From that time until the commencement of this action in December, 1905, the plaintiff took no further action, and the record shows that from the date of the original agreement with Yesler in 1888 nothing was done by Stewart or any of his associates towards the performance of the contract, except that McNaught, prior to Yesler's death, contracted to purchase the south half of block 1, which was afterwards conveyed to one Geo. F. Gund, and that Stewart, in December, 1901, said he was willing to pay one-sixth of the taxes.  After 1901 Seattle's growth caused public improvements, such as streets, sewers, etc., to become necessary, for which the defendant disbursed $12,500 more.  By December, 1905, the property had increased tenfold in value, five to eightfold thereof after December, 1901.

The defendant in its answer pleaded laches, estoppel, and other defenses.  The trial court made findings in substantial accordance with the above statement.  Thereupon the plaintiff paid into court a tender of $5,612.69, and a decree was entered, awarding him specific performance, and appointing a trustee to plat and sell the land and distribute the proceeds, as follows: (1) To the defendant $11,400; (2) to the payment of taxes and other charges; and (3) one-sixth of the remainder to the plaintiff, and five-sixths to the defendant.  The defendant has appealed.

The only defense which we will consider is that of laches. The respondent comes into a court of equity demanding specific performance of the trust agreement.  He claims a one-sixth interest in the profits, admitting his liability for taxes and other disbursements.  The first question presented

is whether he has done equity. He has paid into court one-sixth of the disbursements and taxes with interest, and now stands ready to receive large and immediate profits. But is that doing equity? Has he exhibited at all times a readiness to perform his part of the agreement? If not, has he shown any reasonable excuse for failing to do so? Has his diligence been such as to commend him to the conscience of the chancellor and entitle him to equitable relief or has he been guilty of inexcusable neglect, inactivity and laches, such as will deprive him thereof? In his complaint, without explaining or excusing his delay, he basis his right to recover upon the declaration of trust executed by Jacob Furth, making no reference to the original agreement executed by Henry Yesler in 1888, which originated the trust. Henry Yesler lived four years thereafter. During his lifetime nothing was done by the respondent or his associates, except that McNaught contracted to purchase the south half of block 1, afterwards conveyed to Gund. They did not plat, clear, grade, or improve, nor did they pay taxes.

After Henry Yesler's death, the real estate was sold and, by mesne conveyances, passed to the appellant. It redeemed the property from tax sale, preventing its complete and irrevocable loss. During this time, if the trust agreement was valid and had not been abandoned by the respondent, it was the duty of himself and associates to advance all these taxes and pay for clearing, grading and improvements, but not one dollar did they expend. They did nothing. A period of financial depression ensued and continued for a number of years. The estate of Henry Yesler, its creditors, and the Yesler Estate, Incorporated, severally struggled to save the property from total loss, carrying all financial burdens thereby imposed, but the respondent still remained inactive. In 1898 his associates abandoned and surrendered their interests. Respondent made no formal surrender, yet in view of existing conditions, the depreciation in values, and the unsalable character of the property, it is impossible to conceive

that he did not abandon the trust. It is evident that neither he nor his associates were willing to advance funds for taxes and improvements upon a losing proposition. For nine years after Yesler's death, and for three years after Hunt, McNaught and Lowman had surrendered their interests, the respondents remained inactive, until December, 1901, when, being advised that the appellant was demanding a quitclaim deed, and was insisting that he had no equitable rights, he for the first time expressed a willingness to pay taxes, and claimed an interest. The property had then appreciated in value, but not sufficiently to insure so handsome a profit as it will now yield. Respondent might have ascertained from the county and city officials the taxes and assessments then paid, and might have made an actual tender of his proportion therefor. This he failed to do, contenting himself with a mere expression of willingness to pay. In December, 1901, he was notified that the appellant denied any interest in him. Why, if he then intended to assert a *bona fide claim,* which was disputed by appellant, did he not, within a reasonable time, proceed to enforce his alleged rights? Appellant's attitude called for such affirmative action on his part. 'We are constrained to conclude that the advancement in values had not thus far been such as to promise a sufficient reward for litigation uncertain in its results.

The respondents, after December, 1901, indulged in four additional years of inactivity, then in December, 1905, the property having increased tenfold in value, he instituted this action and, after trial, made his first payment of $5,612.69, at a time when he could realize a large and immediate profit, approximately estimated at $25,000. Should he, after all these years of inactivity, be permitted by a court of equity to realize this large return from property saved and improved by the appellant without assistance from him or his associates? We think not. The facts here constitute a much stronger showing of laches than was presented in *Ferrell v.*

*Lord,* 43 Wash. 667, 86 Pac. 1060, recently decided by this court. In that case we said:

· "There is no inflexible rule controlling the application of the defense of laches. The facts and circumstances of each case must govern courts of equity in permitting said defense to be made. The authorities show that, while lapse of time is one of the elements to be considered in applying this equitable defense to stale claims, it is only one, and that it is not necessarily the controlling or most important one. Regard must be had to all of the facts and surrounding circumstances, and if, when carefully considered, they do not appeal to the conscience of the chancellor, on behalf of a claimant, the defense of laches should be allowed."

See, also, *Hayward v. National Bank,* 96 U. S. 611, 24 L. Ed. 855; *Townsend v. Vanderwerker,* 160 U. S. 171, 16 Sup. Ct. 258, 40 L. Ed. 383.

This action for specific performance was commenced by the respondent after long and unexplained delay, and at a time when the property had increased tenfold in value. Unreasonable delay of a party in performance, or in enforcing his rights when disputed, may shorten the period fixed by the statute of limitations and constitute such laches as will amount to an abandonment of the contract on his part and deprive him of the remedy of specific performance.

"It is indeed generally essential that the party seeking a specific performance should not himself have been backward; that he should not have held off *until circumstances may have changed,* or kept himself aloof so as to enforce or to abandon the contract as events might prove most advantageous." *Ford v. Euker,* 86 Va. 75, 9 S. E. 500.

The plaintiff in *McCabe v. Matthews,* 155 U. S. 550, 15 Sup. Ct. 190, 39 L. Ed. 256, had remained inactive for some nine years, until the land advanced in value from $150 to $7,500. He then sued for specific performance. Mr. Justice Brewer, in closing his opinion, said:

"It seems to us to be a case of a purely speculative contract on the part of the plaintiff; doing nothing himself, he waits

many years to see what the outcome of the purchase by defendant shall be. If such purchase proves a profitable investment, he will demand his share; if unprofitable, he will let it alone. Under those circumstances the long delay is such laches as forbids a court of equity to interfere."

See, also, Fry, Specific Performance (3d ed.), § 1072; *Whitney v. Fox*, 166 U. S. 637, 17 Sup. Ct. 713, 41 L. Ed. 1145; *Patterson v. Hewitt*, 195 U. S. 309, 25 Sup. Ct. 35; *Fowler v. Marshall*, 29 Kan. 665.

Further comment and authority are unnecessary. Equity and good conscience will not permit any relief to the respondent in the face of his laches and long-continued neglect. Were he to recover, there would be no limit to the prosecution of stale claims in violation of the present well-established doctrine of laches as universally announced.

The judgment is reversed, and the cause remanded, with instructions to dismiss the action.

HADLEY, C. J., DUNBAR, and MOUNT, JJ., concur.