[No. 16962. Department Two. July 3, 1922.]

TOM BOWE, *Appellant*, v. PROVIDENT LOAN CORPORATION, *Respondent*.[1]

CORPORATIONS (56)—SALE OF STOCK — RESCISSION — FRAUD — EVIDENCE—SUFFICIENCY. False representations that corporate stock was worth $12.50 and that it had been paying dividends of twelve per cent when it had not, are material, authorizing a rescission of the sale.

SAME (56)—SALE OF STOCK—FRAUD—MISREPRESENTATION OF OFFICERS—LIABILITY. One constituted an agent of a corporation to sell stock so as to net the company nine dollars per share, is not acting solely in his own interest, although he made a profit on the sales; hence the company is chargeable with his misrepresentations.

SAME (56)—RESCISSION—LACHES. Laches, being grounded on the principle of equitable estoppel, will not operate to defeat an action for the rescission of a sale of corporate stock where there are no special circumstances which would render the maintenance of the action inequitable.

Appeal from a judgment of the superior court for Spokane county, Lindsley, J., entered June 27, 1921, in favor of the defendant, in an action to rescind a sale of corporate stock, tried to the court. Reversed.

*C. E. H. Maloy,* for appellant.
*Post, Russell & Higgins,* for respondent.

MAIN, J.—The plaintiff, claiming that he had been defrauded in a transaction whereby he purchased stock in the defendant corporation, brought this action for

[1]Reported in 208 Pac. 22.

rescission.   The cause was tried to the court without a jury, and resulted in a judgment of dismissal.   From this judgment, the plaintiff appeals.

The facts may be summarized as follows:   The respondent, the Provident Loan Corporation, was organized about the year 1913, for the purpose of loaning money on chattel security.   From the time of its organization until March, 1919, one H. T. Irvine was president thereof.   Irvine was also president of H. T. Irvine & Company, a corporation doing a stock brokerage business in the city of Spokane and vicinity. The two companies occupied the same offices and had substantially the same officers.   One S. W. Hoag was designated as manager of the Provident Loan Corporation.   In the latter part of the year 1917, the respondent owed money to one of the banks in the city of Spokane and desired to raise money to liquidate the indebtedness.   A meeting of the directors was held and a resolution was passed which authorized the sale of the treasury stock of the company, which should net the company nine dollars per share, the par value of the stock being ten dollars.   Thereafter, and on or about March 4, 1918, Irvine and one Paul Kent sold to the appellant five hundred shares of this stock for $12.50 per share, in payment for which the appellant gave his note for $2,850, with interest, and turned over to Irvine and Kent twenty shares of stock in the Car Refrigerator Equipment Company, also known in the record as the A. B. C. stock.   This stock was figured at a value of $170 per share.   After the transaction, the note was discounted at a bank, but it does not appear in the record what became of the A. B. C. stock.   The stock which the appellant purchased in the Provident Loan Corporation was issued and delivered to him by the company, and the books of the company show that

it received therefor nine dollars per share; the difference between the nine dollars per share and the $12.50 which the appellant paid for it going, apparently, to Irvine and Kent, who made the sale. In the summer of 1920, the appellant, after inquiry, learned, as he claims, that in the transaction fraudulent representations had been made to him. In October following he brought this action.

The first question is whether fraud had been practiced upon the appellant. At the time of the sale, the evidence shows that it was represented to him that the stock had a value of $12.50 per share; that the company was paying dividends of twelve per cent and was engaged in loaning money to automobile dealers and purchasers, from which loans it made a large profit. The evidence shows clearly and convincingly that the stock was not worth $12.50 per share at the time, or at any other time, and that it had not been paying dividends of twelve per cent. These were material representations, relied upon by the appellant, and he was misled thereby to his injury. It does not require the citation of authority to show that such representations were fraudulent. The respondent, however, contends that the stock at the time had a value of $10.25, and that therefore there was no misrepresentation in that respect. This contention is based upon the evidence of an accountant who audited the books and testified that the paper value of the stock was that sum. This evidence is based upon the assumption that organization and promoting expenses in the sum of $45,110 were an asset of the corporation. This large item was neither cash, accounts receivable, notes receivable, nor physical property. Obviously, in determining the value of the stock, that item could not be included as an asset of the company for the purpose of swelling the paper value of the stock.

The principal question in the case is whether the respondent corporation is chargeable with the fraud committed by its president, H. T. Irvine. In this connection the respondent relies upon an exception to the general rule that the principal is responsible for. the fraud of the agent performing the business of the principal, to the effect that, where an officer of a corporation acts for himself and adversely to the corporation, the presumption cannot be indulged that he would inform his principal of the act done, and that, therefore, the principal would not be chargeable with his fraudulent acts. The question then is whether the respondent is within the exception relied upon. In December, 1917, as shown by the minutes of the respondent corporation, the following resolution was passed:

" 'Mr. Irvine then brought to the attention of the board the advisability of offering the balance of our treasury stock for sale to net the company $9.00 on either common or preferred sales. The money so obtained to be applied towards liquidating our indebtedness at the Fidelity National Bank.'

" 'On motion of Mr. Hickman, seconded by Mr. Cullen, it was permitted to sell our treasury stock at this price until such time as the privilege was revoked by action of board of directors'."

As already stated, Irvine, at the time, was president of the respondent corporation, and also of the allied company. He had charge principally of the matter of selling stock. Hoag's duties were with reference to other matters. By this resolution there was direct authority from the company to sell the treasury stock so as to net nine dollars per share. The resolution recites that "it" was permitted to sell treasury stock at the price mentioned. There is controversy here over whether "it" refers to Irvine or to H. T. Irvine & Company. It cannot be doubted that, by this resolu-

tion, either Irvine or H. T. Irvine & Company was constituted the agent of the respondent corporation for the sale of stock, and that, in pursuance of this authority, the stock purchased by the appellant was acquired. It is not necessary to determine whether "it" should be read "he" and thereby refer to Irvine, or whether it should be read as written and construed to refer to H. T. Irvine & Company. In either event, the respondent was responsible for the misrepresentations. If Irvine, in making the sale, was acting individually as the agent, the company would be chargeable with his fraudulent conduct. The case does not come within the line of authorities cited by respondent holding that, where an officer of a corporation acts for himself and adversely to the corporation, the latter is not charged with his fraudulent conduct. In this case, while Irvine and Kent made a profit on the sale of the stock, the company received therefor exactly what its resolution specified it should receive. In making the sale upon such terms, Irvine was not acting solely for himself and adversely to the corporation. If the resolution appointed H. T. Irvine & Company the agent for the sale of the stock, a like result follows, that company being a corporation but only acting through its officers, and if Irvine, in making the sale, was acting as the agent of H. T. Irvine & Company, it is difficult to see why the respondent company would not be chargeable with his misrepresentations. Even if he were a sub-agent the respondent company still would be liable. In *Nelson v. Title Trust Co.*, 52 Wash. 258, 100 Pac. 730, upon the question of liability of a principal for the conduct of a sub-agent who had committed a fraud, it was said:

"We judge from the remarks interjected by the court during the trial that it entertained the view that the owner of the land was not responsible to the purchaser

for the fraudulent representation of its selling agent. This, we think, was a wrong theory of the law. The owner is the beneficiary of the sale. The salesmen are his agents, and under the ordinary rule of agency the owner is responsible for the representations of his agent made in the line of his employment. It is true that the agency in this case is one degree removed, Erickson, who sold the lots to appellant, having been employed by Arnold & Nachant, the firm who had a contract with the owner to sell the addition, Arnold & Nachant agreeing to divide with Erickson their commission on lots sold by him. But this was a mere detail as to the manner of sale by Arnold & Nachant. The owner was still equally the beneficiary of the transaction, and it would tend to encourage fraudulent misrepresentation if such owner were allowed to escape responsibility through the subterfuge of having the sale made by a subagent. It must not be allowed to disclaim responsibility and at the same time receive the benefit of the fraudulent transaction.''

It is a well established rule that a corporation cannot reclaim or retain the benefits which it has received from the sale of stock through the fraud of its agents. Where there is such fraud the corporation is liable to the extent that it has profited by such misrepresentations. This rule applies to the sale of treasury stock as well as original subscriptions. In *Mulholland v. Washington Match Co.,* 35 Wash. 315, 77 Pac. 497, it was said:

''Concerning the general principle governing fraud in obtaining subscriptions to the capital stock of a corporation, the above cited volume of Cook on Stock & Stockholders, at § 140, further states the rule as follows:

'' 'The modern doctrine, however, both in this country and in England, has completely exploded the theory that corporations are not chargeable with the frauds of their agents in taking subscriptions. The well-established rule now is that a corporation cannot claim or retain the benefit of a subscription which has

been obtained through the fraud of its agents. The misrepresentations are not regarded as having actually been made by the corporation, but the corporation is not allowed to retain the benefit of the contract growing out of them, being liable to the extent that it has profited by such misrepresentations. The question of the authority of the agent taking the subscription is immaterial herein. It matters not whether he had any authority, or exceeded his authority, or concealed its limitations. The corporation cannot claim the benefits of his fraud without assuming also the representations which procured those benefits.'

''The above stated rule pertaining to subscribers for stock applies with equal force here. It is true, respondent was not an original subscriber for stock, but he was a purchaser of shares which belonged to the company, theretofore set apart as treasury stock. The contract of purchase was with the company, and the money paid was as much for the benefit of the company as if paid on an original subscription.''

Prior to the time that the present action was begun, the appellant tendered back the stock which he had received. He is entitled to recover the sum of $4,500 which was received by the company.

Finally, it is contended that the appellant should be denied the right to prevail because of laches. The doctrine of laches is grounded upon the principle of equitable estoppel, and before it can be applied there must be some special circumstance which would render the maintenance of the action inequitable. *Gray v. Reeves,* 69 Wash. 374, 125 Pac. 162; *Bergman v. Evans,* 92 Wash. 158, 158 Pac. 961, Ann. Cas. 1918C 848. The record in the present case presents no facts or circumstances which make the prosecution of this action inequitable. It is true that, at the time of the trial, Irvine had disappeared after having got the company in serious financial troubles and could not be produced as a witness. Kent, who knew of the deal and was

present when the representations were made, gave his version of the transaction. Even though the testimony of Irvine could not be produced, this was not a circumstance which would call for the application of the doctrine of laches.

The judgment will be reversed, and the cause remanded with direction to enter a judgment as here indicated.

PARKER, C. J., HOLCOMB, MACKINTOSH, and HOVEY, JJ., concur.