[No. 29157.   Department Two.   November 6, 1943.]

ALICE MCKNIGHT et al., *Respondents*, v. CHARLES BASILIDES, *Appellant*, RUTH ALLISON, *Defendant*.[1]

[1]Reported in 143 P. (2d) 307.

W. C. *Hinman* and D. A. *Maurier*, for appellant.

*William A. Gilmore* and W. H. *Cook*, for respondents.

SIMPSON, C. J.—This is an action for the partition of real estate and for an accounting of the income obtained by the defendant in possession. Judgment of default was entered against defendant Ruth Allison.

At the conclusion of the trial, the court made findings of fact and conclusions of law, and entered its decree of partition. The decree provided (1) that each of plaintiffs had an undivided one-sixth interest in two pieces of real estate, one at 5203 First avenue northwest, known as the "big house," and the other at 326 West Forty-first street, known as the "little house," both properties being situated in the city of Seattle; (2) that plaintiffs have judgment against Charles Basilides in the sum of $1,083.16 for their share of the rents and rental use of the property, and that the judgment was a lien upon the interest of Charles Basilides in the property; (3) that the house and lot at 5203 First avenue northwest be sold in the manner provided by law relative to partition and sale of real estate; (4) that the property

at 326 West Forty-first street be not sold; (5) that plaintiffs be allowed an attorney's fee of five hundred dollars and that a like sum be allowed counsel for defendants. Both amounts were made a lien on the proceeds of the sale of the property at 5203 First avenue northwest. The decree further provided for the appointment of a referee to sell the First avenue property. Defendant Charles Basilides appealed.

The assignments of error are in holding that possession of appellant was never at any time adverse to respondents and requiring appellant to make an accounting; in not allowing appellant a lien on the property for the taxes and assessments paid and improvements made; in ordering an accounting for rents and profits received more than three years prior to the beginning of the action; in not dismissing the action because of laches, bad faith, and lack of equity on the part of respondents; and in giving respondents a lien on the interest of appellant in the property.

The facts are these: In the year 1901 appellant married Alice King in the city of Chicago. At the time of her marriage to appellant, Mrs. King had two children by a former marriage, Alice, now Alice McKnight, and Fred W. King. Defendant Ruth Allison is the child of appellant and his wife Alice. During the year 1907 the family moved to Seattle, where appellant engaged in business and acquired two pieces of real property, one known in the evidence as the "little house," located at 326 West Forty-first street, and the other, known as the "big house," located at 5203 First avenue northwest, both in the city of Seattle.

Alice Basilides died intestate November 20, 1929, and the estate has never been probated. Appellant has been in possession of both pieces of property since the death of his wife, and has paid all the taxes and assessments levied against the property. In addition, he made certain improvements upon the real estate. He rented the "little house" and occupied the "big house" as his home. During the time from the death of his wife, Alice, until a few days prior to the beginning of this action, appellant never made any claim to respondents that he was the sole owner of the

property, nor did respondents make any claim to the property during the same period of time.

The assignments of error present three questions for consideration: (1) Did appellant obtain title to the real estate by adverse possession? (2) Should appellant be compelled to make an accounting of income from the property? (3) Were respondents entitled to a lien upon appellant's interest in the property for the amount found due after accounting? We will discuss the questions in the order set out above.

Appellant contends that the evidence shows him to have been in actual, uninterrupted, open, notorious, hostile, and exclusive possession of the property under claim of right since November 20, 1929, and for that reason he has acquired title by adverse possession.

■ The general rule relative to securing title to property owned in common by adverse possession is found in the following comprehensive statements:

"Since acts of ownership which, in case of a stranger, would be deemed adverse and per se a disseisin, are, in cases of tenancies in common, susceptible of explanation consistently with the real title, they are not necessarily inconsistent with the unity of possession existing under a cotenancy. For this reason, whether the acts of ownership will be such as to break and dissolve the unity of possession, constitute an adverse possession as against the cotenants, and amount to a disseisin, depends upon the intent with which they are done, and upon their notoriety and essential character. Accordingly, it is a general rule that the entry of a cotenant on the common property, even if he takes the rents, cultivates the land, or cuts the wood and timber without accounting or paying for any share of it, will not ordinarily be considered as adverse to his cotenants and an ouster of them. Rather, such acts will be construed in support of the common title. Mere exclusive possession, accompanied by no act that can amount to an ouster of the other cotenant, or give notice to him that such possession is adverse, will not be held to amount to a disseisin of such cotenant. Mere intention, unannounced, is not sufficient to support a claim of adverse title. Although the exclusive taking of the profits by one tenant in common for a long period of time, with the knowledge of the other cotenant

and without any claim of right by him, may raise a natural presumption of ouster upon which the jury may find the fact to exist, if it satisfies their minds, yet the law will not, from this fact, merely raise a presumption of such ouster.

"Generally, a cotenant's sole possession of the land becomes adverse to his fellow tenants by his repudiation or disavowal of the relation of cotenancy between them, and any act or conduct signifying his intention to hold, occupy, and enjoy the premises exclusively, and of which the tenant out of possession has knowledge, or of which he has sufficient information to put him upon inquiry, amounts to an ouster of such tenant. In other words, where one cotenant occupies the common property notoriously as the sole owner, using it exclusively, improving it and taking to his own use the rents and profits, or otherwise exercising over it such acts of ownership as manifest unequivocally an intention to ignore and repudiate any right in his cotenants, such occupation or acts and claim of sole ownership will amount to a disseisin of his cotenants, and his possession will be regarded as adverse from the time they have knowledge of such acts or occupation and of the claim of exclusive ownership. A writing is unnecessary, but the claimant must show a definite and continuous assertion of an adverse right by overt acts of unequivocal character clearly indicating an assertion of ownership of the premises to the exclusion of the right of the other cotenants." 1 Am. Jur. 824, Adverse Possession, § 54.

"It is a general rule that an entry upon real property by a tenant in common claiming an adverse possession against his cotenants can never become the foundation of such a title until such cotenants first have had actual knowledge of the repudiation of their rights. The law deems the possession to be amicable until the tenant out of possession has in some way been notified that it has become hostile." 1 Am. Jur. 826, Adverse Possession, § 56.

In the following cases this court has adhered to the rule of law just quoted.

In *Cox v. Tompkinson,* 39 Wash. 70, 80 Pac. 1005, Hiram Muzzy made a homestead entry on land near Spokane Falls in 1880, and lived on the property for some time with his family. His wife died, January 6, 1886, leaving as heir one child. Immediately after receiving his final receiver's receipt, Muzzy platted a part of the land into streets, alleys,

lots, and blocks as an addition to the city of Spokane Falls. The streets and alleys were dedicated to the public use. Thereafter he placed a mortgage upon a portion of the lots and blocks. The mortgage was thereafter foreclosed and the property purchased by the mortgagee, who went into possession at once and thereafter paid taxes and assessments. Many of the lots were sold and improved for business and residential purposes. The streets were used and improved by the city. The daughter of Muzzy and wife lived with her father until 1887, and thereafter for many years lived near the property and was acquainted with the actions of her father and those who succeeded him as owners of the property. In upholding a decree establishing title by an adverse possession in the purchaser at the foreclosure sale, this court said:

"As the possession of land, held by a common title by one tenant in common, does not imply hostility, as does possession by a stranger to the title, stronger evidence is required to show an adverse holding by a tenant in common than by a stranger, but the evidence need not differ in kind. Actual verbal or written notice is not necessary to start the statute running in such a case. If there be outward acts of exclusive ownership by the tenant in possession, of such a nature as to preclude the idea of a joint ownership, brought home to the cotenant, or of so open and public a character that a reasonable man would discover it, it is sufficient. 1 Cyc. 1071 *et seq.* The facts in the case before us we think show conclusively that the possession of Hiram Muzzy of the homestead property was at all times adverse to the appellant. He not only had and maintained exclusive control and dominion over it as long as he retained the title, but his outward acts with reference thereto were inconsistent with any other idea than that of sole ownership. We think, too, they were of sufficient publicity and notoriety to put the appellant upon notice of his claim. It would be difficult to give more publicity to one's claim of ownership and title to real property than to plat the same into lots and blocks as an addition to a city, and sell and convey such lots by deeds of warranty."

The facts in *Graves v. Graves,* 48 Wash. 664, 94 Pac. 481, show that husband and wife owned two pieces of real prop-

erty. The husband, Norris Graves, obtained a decree of divorce which did not dispose of the real estate. Graves retained exclusive possession of the property for over thirteen years, collected rents, paid taxes, and made some slight improvements. In deciding the case, we said:

"The decree therefore left them tenants in common of that property. *Ambrose v. Moore*, 46 Wash. 463, 90 Pac. 588. It is true she has made no effort to enforce her interest in the property since that time, and it is also true that he has collected the rents and paid the taxes, but there was no communication between the parties until about 1906, when an effort was made by the respondent to purchase the interest of appellant and, not being able to agree upon the price, the respondent then notified the appellant that she had no interest in the lots, and then the appellant brought this action. There can be no doubt that, during all the years since the divorce was granted in 1893, the property was joint property, and has been held by the respondent who was a cotenant with the appellant. The general rule in regard to adverse possession by one cotenant against another is stated in 1 Cyc. 1071, as follows:

" 'The entry and possession of land under the common title by one cotenant will not be presumed to be adverse to the others, but will ordinarily be held to be for the benefit of all.' "

Following a quotation from *Cox v. Tompkinson, supra,* the court continued:

"In this case the outward act of ownership consisted in possession, the collection of rents, and the payment of taxes by the respondent.

" 'The mere receipt and retention by one cotenant in possession of all the rents and profits does not of itself constitute an adverse possession, and will not ripen into title as against the others, though continued for the statutory period.' 1 Cyc. 1076.

"The property appears to have been improved property, consisting of two dwelling houses. It was not shown that the rents and profits do not meet the taxes and other necessary expenses, or that respondent had refused to account for rents, or that appellant had ever requested an accounting. In fact, the appellant appears to have made her home in places distant from Spokane, and had no communication with respondent from 1893 until about 1906. We think she

had a right to assume that the rents would meet all the expenses and that the respondent was holding the property as cotenant, because there were no outward acts which would put her on notice of an adverse claim. We do not think the appellant was guilty of laches. The record shows no improvements to have been made on the property since the separation of appellant and respondent. There has been no change of condition and no platting or mortgages or sales of any part of the property, as was the case in *Cox v. Tompkinson, supra."*

In *Church v. State,* 65 Wash. 50, 117 Pac. 711, it appears that in 1872 four men owned a tract of land upon which there were situated two springs. The land was divided into three separate tracts by mutual deeds. The deeds gave each owner of the separate tracts the right to use the springs in common. In 1872 one parcel and in 1886 another portion of the land, including the one upon which the springs were situated, were deeded to Washington Territory. In 1886 the territory enclosed the springs with a substantial fence and commenced to use all of the water for purposes of its own. In 1902 Louise Church obtained title to the remaining portion of the land by warranty deed which did not mention the springs. In holding that the territory of Washington had title to the springs by adverse possession, this court said:

"It [the territory of Washington] took immediate possession, fenced the springs, and for six years used all of the water for hospital and power purposes. Its possession was peaceable, continuous, open, exclusive, notorious, and adverse to appellant's grantors. In the absence of additional facts or circumstances sufficient to show an ouster, exclusive possession by one tenant is not adverse as against his cotenant, but is ordinarily the possession of both. Mere possession by one cotenant alone will not ripen into title by adverse possession, even though it be continued without interruption for the period of the statute of limitations. There must be an ouster followed by adverse possession for the statutory period to determine the estate of the tenant not in possession. Has there been an ouster in this action? If there has, the statute of limitations has run and respondent has acquired an absolute title by the suc-

ceeding and continued adverse possession. 1 Am. & Eng. Ency. Law (2d ed.), p. 801-806, and cases cited.

"To show an ouster of one tenant in common by his co-tenant requires stronger and more convincing evidence than is necessary to sustain an ordinary claim of adverse possession. We think, however, the evidence of ouster of appellant's grantors by respondent and its grantors is clear and convincing. This is our conclusion, although we recognize the well-established rule that, when adverse possession is relied upon as an ouster, either the tenant out of possession must have actual notice of the adverse holding, or the hostile character of the possession must be so manifest, open, and notorious that notice on his part will be presumed."

In *Goulette v. Goulette*, 114 Wash. 689, 195 Pac. 1045, we find the following facts: Goulette and wife owned four lots. Mrs. Goulette died and her estate was never probated. Mr. Goulette retained exclusive possession of the real property for more than twenty-five years. We held that the children of Mrs. Goulette did not lose title to their interest in their mother's estate, and, in passing upon the question, said:

"The appellant and his children became tenants in common, and the appellant had no right to transfer their interest. The fact that they may have allowed him to handle the property as though he were the sole owner would give him no greater right than that of a trustee acting in their behalf."

When we apply the rules just set out to the facts present in the case at bar, we find that they are like those present in the *Graves* and *Goulette* cases and dissimilar to those in the *Cox* and *Church* cases. We therefore hold that the evidence in this case was not sufficient to establish the claim that appellant made any adverse claim to the property, and that the facts indicate that his actions in living in the "big house" and collecting rents from the "little house" were not such outward acts as would amount to adverse possession.

Appellant argues, however, that the action was not commenced within the time limited by law. There is no

merit in this contention. The statute of limitations does not begin to run in cases of this character until notice has been made of an adverse holding or claim on the part of one seeking title by adverse possession, and there has been an ouster. *Hicks v. Hicks,* 69 Wash. 627, 125 Pac. 945. Accord: *Adams v. Hopkins,* 144 Cal. 19, 77 Pac. 712; *Ludey v. Pure Oil Co.,* 157 Okla. 1, 11 P. (2d) 102; *Fowler v. Hardee,* 16 S. W. (2d) (Tex. Civ. App.) 154.

██ It is next claimed that respondents were guilty of laches which estopped them from claiming an interest in the property. Appellant argues that respondents deliberately delayed their action for fourteen years and concealed their claim in the hope of profiting by the delay and the ignorance of the claim on the part of appellant. He argues that the intent to delay on the part of respondents is proven by certain testimony given by Mrs. McKnight. About a year after appellant remarried in 1933 and after appellant had asked her to sign a quitclaim deed to the properties, Mrs. McKnight consulted a lawyer concerning her interest in the property. Her testimony relative to the visit to the attorney was as follows:

"A. Yes, and I went to him and I says,— After he looked it up to see if he had probated anything and there wasn't anything probated at all, he says, 'They can't do a thing. There won't be anything done until it is probated.' And he says, 'I wouldn't worry a thing about it until it is probated,' he says, 'Let them start probating and then it is time for you to start in.' "

He presents figures to prove that, if the estate had been probated, he would have received over $4,000 and the respondents about $400 each, but that, under the present judgment, he will receive approximately $200 and respondents over $3,000.

"Laches is a doctrine of equity. It does not arise from mere lapse of time alone, but arises upon lapse of time together with some intervening change in the condition or relation of the parties adversely affecting the rights of the party sought to be charged. To constitute laches not only must there have been delay in the assertion of the claim, but some change of condition must have occurred which would

make it inequitable to enforce the claim." *Lindblom v. Johnston,* 92 Wash. 171, 158 Pac. 972.

Mere delay, lapse of time, and acquiescence do not defeat the remedy unless so long continued that in a particular case its changed condition would make it inequitable to allow recovery. *Gray v. Reeves,* 69 Wash. 374, 125 Pac. 162; *State ex rel. Kubel v. Plummer,* 130 Wash. 135, 226 Pac. 273; *Reiner v. Clarke County,* 137 Wash. 194, 241 Pac. 973; *State ex rel. Hearty v. Mullin,* 198 Wash. 99, 87 P. (2d) 280.

"The doctrine of laches is grounded upon the principle of equitable estoppel, and before it can be applied there must be some special circumstance which would render the maintenance of the action inequitable." *Bowe v. Provident Loan Corp.,* 120 Wash. 574, 208 Pac. 22.

" . . . where parties are equally at fault, neither can successfully assert laches against the other." *National City Bank v. International Trading* Co., 167 Wash. 311, 9 P. (2d) 81.

While in considering the charge of laches, we apply the general rules of equity, it must be borne in mind that, "The question is dependent upon the inherent equities of the particular case." *Young v. Jones,* 72 Wash. 277, 130 Pac. 90; 30 C. J. S. 528, Equity, § 115.

This court has had occasion to discuss the question of laches in several cases. In the cases just following, the court approved that defense.

*Stuart v. Pierce County,* 40 Wash. 267, 82 Pac. 270, where plaintiff stood by for five years, during which time expensive litigation was conducted concerning land upon which he claimed to have an undisclosed lien.

*Ferrell v. Lord,* 43 Wash. 667, 86 Pac. 1060, where plaintiffs owned land in common with their father and did not assert their rights for fourteen years after they acquired their interest, which was thirteen and one-half years after their father claimed the entire title and seven years after the foreclosure of a mortgage he placed upon the property.

*Stewart v. Yesler Estate,* 46 Wash. 256, 89 Pac. 705. Plaintiffs waited from 1888 to 1905 to assert a claimed right in

real estate, during which time they failed to perform their portion of an agreement relative to the property, and it had increased ten-fold in value.

*Kline v. Galland,* 53 Wash. 504, 102 Pac. 440, in which it appears a minor gave a deed to his interest in real estate and waited almost one year after becoming of age to repudiate the deed and to have certain orders in probate vacated which had been of record for fifteen years.

*Cunningham v. Independence Consolidated Mining Co.,* 58 Wash. 371, 108 Pac. 956. Plaintiff delayed seven years to make a claim which he contended arose from a contract concerning stock in a corporation. During that time he had knowledge of the breach, and his violation of the agreement jeopardized the corporate property.

*Little Bill v. Swanson,* 64 Wash. 650, 117 Pac. 481. Claimant to property waited from 1888 until 1905 to prosecute an action for an interest in property, during which time title had been adjudged in another by the probate court, and claimant knew of the adverse possession and claim of ownership.

*Harvey v. Laurier Mining Co.,* 106 Wash. 192, 179 Pac. 864. An owner of an interest in a mining location waited ten years to assert his claim, knowing that a relocator who claimed the property was doing assessment work.

*Teeter v. Brown,* 130 Wash. 506, 228 Pac. 291. Plaintiff neglected for fifteen years to ascertain what was being done with mining property in which he claimed an interest and which had greatly increased in value.

*Meyer v. Trantum,* 135 Wash. 449, 237 Pac. 1006. Heirs to real property waited twenty-six years to claim their interest from their mother, during which time she asserted absolute title and leased and mortgaged it as her own on several occasions

In the following cases we have held that the defense of laches was not available:

*Graves v. Graves,* 48 Wash. 664, 94 Pac. 481. A divorced wife sued for partition of property owned in common after waiting thirteen years, during which time her husband had possession, collected rents, and paid taxes.

*Crodle v. Dodge,* 99 Wash. 121, 168 Pac. 986, in which it is disclosed that plaintiff unknowingly signed a quitclaim deed to real property and waited from 1903 to 1915 to bring an action for the purpose of canceling the deed.

See, also, *Gray v. Reeves,* 69 Wash. 374, 125 Pac. 162; *State ex rel. Hearty v. Mullin,* 198 Wash. 99, 87 P. (2d) 280; and *Lavigne v. Hughes,* 199 Wash. 285, 91 P. (2d) 560.

It will be noticed that in the first cases to which we have referred the facts are unlike those we have in the case at bar in which the court held that the defense of laches was available. However, a study of all the cases demonstrates the fact that this case is governed by the last decisions mentioned.

■ The situation is best explained by the trial judge in his oral decision made at the close of the trial, when he said:

"That brings me to the question raised here of laches. Now, suppose these girls, a month after the mother died, when they found the father had not taken out letters of administration, had taken out letters of administration, had this estate probated, this father would have been worse off today than their silence has left him. He is worth more today by their not asserting that right than if they had asserted it and left him with only half of the property. So laches does not put him in any worse position. The only effect of it is that he is today in a better position by reason of what is called laches than he would have been, in a much better position. So that disposes of the doctrine of laches."

The lapse of time did not obscure any evidence in this case. All of the witnesses who could have testified relative to the situation and condition of the property in 1929 were available at the trial of this case, and there is no showing that any material documents were lost or destroyed. Appellant's argument that he would have received more from the property had the estate been probated promptly loses its force when we call to mind that he could have himself probated the estate immediately after the death of his wife in 1929. If there was any undue delay, he was a party to

that delay and cannot now urge the defense of laches against his cotenants.

We hold that respondents were not estopped by their delay in instituting this action.

■ The trial court compelled appellant to make an accounting. In so doing, appellant was given credit for repairs, improvements, taxes, and insurance in the amount of $4,753.46. He was then charged for the use of the properties between November 20, 1929, and May, 1943, in the total sum of $8,001. Respondents were given a judgment in the sum of $1,083.18 for their share of the rental use of the two properties, and the judgment was made a lien upon the interest that appellant owned in the properties. A portion of the income received consisted of rentals for the "little house," which was sold April 1, 1938, on a partial payment sales contract. Since the date of the sale, appellant was charged a reasonable value for its use. The charge for the use of the "big house" was fixed at an amount which the court found from testimony to be the reasonable rental value thereof. The record discloses that the income was at all times sufficient to pay the taxes and other expenses. The improvements were of a minor nature and did not to any appreciable extent enhance the rental or sales value of the property.

Appellant was responsible for and was properly held to an accounting of the rents he received from the "little house." Thompson on Real Property (Perm. ed.), vol. 4, p. 431, § 1908.

The charge for the occupancy of the "big house" and the reasonable rental value of the "little house" subsequent to its sale presents a more difficult problem.

The general rule is stated as follows in 62 C. J. 446, Tenancy in Common, § 64:

"While there is some authority in the United States to the contrary, based apparently upon the assumption that the Statute of Anne has become a part of the common law of the particular jurisdiction and upon an interpretation of that statute at variance with that adopted by the English courts, the generally accepted rule is that at common law

one tenant in common who occupies all or more than his proportionate share of the common premises is not liable, because of such occupancy alone, to his cotenant or cotenants for rent or for use and occupation. He may become liable therefor, however, because of an express or implied agreement or if he stands in a fiduciary relationship to his cotenant, or where he has ousted his cotenant and, in some jurisdictions, liability is placed on him by virtue of express statute or because of the interpretation placed upon statutes similar in their terms to that of the Statute of Anne. Notwithstanding the rule may prevail in the particular jurisdiction that a cotenant may be charged for the use and occupancy of more than his proportionate share of the common premises, the circumstances of the particular case may require a denial of the application of the rule as inequitable, as where the occupancy has been with the acquiescence of the cotenants or the other cotenants have abandoned the occupancy of the property and declined to occupy it.

"If common property was unoccupied without the fault of any of the tenants in common then, on an accounting between them, none of them should be charged for the use of the property."

Accord: Thompson on Real Property (Perm. ed.), vol. 4, p. 434, § 1911.

This court has passed upon the question of an accounting by cotenants in possession in several cases to which we now call attention.

In *Leake v. Hayes*, 13 Wash. 213, 43 Pac. 48, 52 Am. St. 34, Charles Washburn died in 1880, leaving a widow and minor children. He had executed a will leaving his property to his wife, but did not mention his children in the will. The probate court entered a decree which recited that the widow was the owner of the real estate. The land at that time was unproductive. Mrs. Washburn remarried, and she and her second husband improved the land until it reached a highly productive stage. One of her children instituted an action for partition. This court held that, if those in possession were

". . . liable at all for use and occupation, or rents and profits, their liability did not arise until after demand was made therefor by the respondent."

In *Eckert v. Schmitt,* 60 Wash. 23, 110 Pac. 635, it appears that individuals owned property as tenants in common. This court held that those not in possession were entitled to an accounting and partition.

The rule is restated in *Daniel v. Daniel,* 106 Wash. 659, 181 Pac. 215, in the following words:

"Where one tenant in common enters upon the common estate which in its then condition yields no profit, and so improves it as to make it productive, he is entitled to all of the profits produced by means of his improvements. *Leake v. Hayes,* 13 Wash. 213, 43 Pac. 48, 52 Am. St. 34. And also when the profits are the result of the individual labors of the tenant in possession, and no demand for an accounting has been made, an accounting will not be decreed. *Crodle v. Dodge,* 99 Wash. 121, 168 Pac. 986. But the general rule is to the contrary, the instances where an accounting is refused being exceptions to and not expressive of the general rule. *Eckert v. Schmitt,* 60 Wash. 23, 110 Pac. 635; *Schuster v. Schuster,* 84 Neb. 98, 120 N. W. 948, 29 L. R. A. (N. S.) 224; 18 Ann. Cas. 1078, and notes."

Appellant cites *Womach v. Sandygren,* 107 Wash. 80, 180 Pac. 922, as authority for the rule that accounting between cotenants will not be required until after demand or the owner in possession holds the property adversely. However, what was said about the requirement of a demand in cases in which there was no adverse possession was not necessary to a decision of that case and is therefore of no controlling influence.

The last expression of this court upon the question under discussion is found in *In re Foster's Estate,* 139 Wash. 224, 246 Pac. 290. The facts in that case were that one John Foster was the owner of an undivided one-half interest in real estate upon which he made his home. The other half was owned by his children. After the death of his wife, Foster remarried and subsequently died. The surviving spouse brought an action against the children for taxes, insurance, and improvements made upon the property. The evidence showed that the taxes and insurance had been paid by Foster, and that his widow had made a number of

improvements on the property. The trial court denied the right to show the rental value of the use of the premises occupied by the widow from the time of the death of Foster. This court reversed the case and in so doing stated:

"Objection is also made that the court refused to allow recovery for the rental value of the premises occupied by Adeline Foster from the time of decedent's death. If it is sought to render a money judgment in favor of Adeline Foster for improvements made from her separate funds, there should be offset against this one-half of the reasonable rental value of the premises from the time of decedent's death. The court was of the opinion that the claim for rent should be filed in the matter of the estate. But the occupancy by Adeline Foster of the premises in question was not an occupancy as administratrix. It was personal. As to the one-half belonging to the estate, she may be required at the time of her final account as administratrix to render an account as to its rental value, if the circumstances justify, but as to the one-half belonging to the other cotenant, her use is a personal one, which can be offset against any claim that she has against the cotenants.

"The cause is reversed with instructions, (1) to ascertain if the improvements made upon the premises were necessary, or to what extent they enhanced the value thereof; (2) to ascertain the reasonable value of the rental of the premises, and allow recovery for one-half of that amount."

■ It will be noted that the *Leake* case adheres to the general law which we have quoted, while the *Eckert, Daniel,* and *Foster* cases adopt the principle that the cotenant in possession must account for his personal use of that portion of the property which he does not own. We are not disposed to follow the general rule laid down in 62 C. J., *supra,* for the reason that it is not an equitable one. There is no sound basis for the general rule of law. No practical or reasonable argument can be advanced for allowing one in possession to reap a financial benefit by occupying property owned in common without paying for his personal use of that part of the property owned by his cotenants. The fairest method in cases in which the cotenant occupies and uses common property, instead of renting it out, is to charge him with its reasonable rental value. Of course there would

be an exception to this holding in cases where the income resulted from improvements placed upon the property by the cotenant in possession. Appellant used the "big house" as a home for many years, and it was proper that he be charged with the reasonable rental value of that use and made to account to his cotenants for their share of that rental value. However, appellant should not be charged with the rental value of the "little house" after its sale, for the reason that he did not receive any rent, nor did he occupy or use it in any way.

Appellant maintains that he should be allowed ten per cent interest on the amounts he paid for taxes and assessments, basing his contention upon the provisions of Rem. Rev. Stat., § 9415 [P. C. § 1051]. He cites, as additional authority, *Olson v. Chapman*, 4 Wn. (2d) 522, 104 P. (2d) 344. Neither the statute nor the holding in the above mentioned case have any application to the facts presented in the case at bar. The statute contemplates that a cotenant shall receive interest upon funds owned and advanced by him. In the instant case, the amounts paid for taxes and assessments were less than the amounts of income from the property, and appellant's payments in fact amounted to payments from funds jointly owned. The facts in the cited case showed that the tenants paid the taxes from their own funds and not out of moneys derived from the property income. The trial court ruled correctly in not allowing interest to appellant.

Finally, it is argued that the court erred in impressing a lien upon the interest which appellant owned in the property. It is true that no lien exists in favor of one cotenant against the share owned by the others. However, the court may, in the exercise of its equitable powers and in order to do full justice to all parties concerned, impose a lien upon the interest in the property owned by the one who has benefited by possession, and may provide for the payment of the judgment from the proceeds of the sale in a partition action. 14 Am. Jur. 107, Cotenancy, § 40.

The judgment will be modified by striking therefrom the charge for use of the "little house" subsequent to the time it was sold. In all other particulars, the judgment will be affirmed.

MILLARD, BLAKE, and ROBINSON, JJ., concur.

MALLERY, J. (dissenting)—"The generally accepted rule is that at common law one tenant in common who occupies all or more than his proportionate share of the common premises is not liable, because of such occupancy alone, to his cotenant or cotenants for rent or for use and occupation." 62 C. J. 446, Tenancy in Common, § 64.

This rule accords well with the rule that, in the absence of an ouster, the cotenant's possession is not adverse. In the face of the presumption of permission, the hostile character of the possession must fail. Therefore, the majority opinion rightly holds that appellant's claim to title by adverse possession cannot prevail.

By the same token, since the adverse possession failed by reason of the permissive nature of his possession, he cannot be held liable for rent for the use of the "big house." His cotenants deliberately let him "carry the burden" during the depression years. They cannot now deny their permission without establishing his hostile possession. Of course, the rentals for the "little house" were received in trust for his cotenants.

Appellant has been charged in the accounting with his share of $8,001 of the rental value on the "big house" for the period beginning November 20, 1929, and ending May, 1943, which is over thirteen years. Rem. Rev. Stat., § 157 [P. C. § 8162], limits an action for the rents and profits or for the use and occupation of real estate to a period of six years. He should have been charged nothing. Even a stranger to the title could have been held for only six years. I dissent.

December 11, 1943. Petition for rehearing denied.