[No. 18546.   Department Two.   August 21, 1924.]

J. E. TEETER, *Appellant*, v. J. C. BROWN, *Respondent*.[1]

EQUITY (41)—LACHES—STALE DEMAND—LAPSE OF TIME.  A complaint for a one-third interest in an Alaska mining claim and for one-third of a million dollars taken from the claim presents a case of a stale demand, and is demurrable, where it appears that plaintiff did nothing for fifteen to eighteen years to learn what was being done with his property by a man whom he dealt with as a stranger, and any inquiry would have long since disclosed the great value of the claim and that gold of the value of more than a million dollars had been taken from it by one fraudulently claiming to own the claim.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered July 18, 1923, dismissing an action for equitable relief, upon sustaining a demurrer to the complaint.   Affirmed.

*Walter B. Allen*, for appellant.

*Peters & Powell* and *J. W. Albright*, for respondent.

[1]Reported in 228 Pac. 291.

BRIDGES, J.—The plaintiff appeals from a judgment dismissing his suit, after a demurrer to the complaint had been sustained. That instrument is so long that we cannot do more than here give its substance, construing it most favorably for the appellant. The facts, as alleged, are as follows:

Very early in January, 1901, the appellant was preparing to locate claim No. 1, below discovery, on Little Creek, in the Nome, Alaska, mining district. The intention was that his location would be for himself and a Mrs. England, who was his close friend. Respondent, a comparative stranger, learned that the location was about to be made and suggested that he be permitted to make it and do the assessment work, holding the property in equal shares for himself, Mrs. England and the appellant. The program, however, was not carried out, but it was agreed that Mrs. England should do the locating in behalf of the three. This she did.

In January, 1902, the claim was again subject to location, possibly because the necessary amount of assessment work had not been done. At any rate, on the last named date, respondent located the claim in his own name, but led the appellant to believe that it was made for the benefit of the three persons named, and according to prior arrangements. In 1903, the respondent, for the purpose of deceiving the appellant and Mrs. England, procured a Mr. Cavender to relocate the claim, with the fraudulent understanding between them that, when relocated, Mr. Cavender would transfer the property to the respondent. Under the guidance of the latter, and for the purpose of deceiving the appellant, Cavender re-named the claim and, as a part of the fraudulent scheme, transferred it to the respondent.

Prior to the Cavender entry, the appellant left for the state of California, to be absent for an indefinite time, and before leaving made arrangements with respondent to keep him informed concerning any interesting developments with reference to the claim. In 1903 or 1904, the respondent learned that the claim was of great value, but he did not impart such information to either appellant or Mrs. England. During the following years, the respondent took from the claim gold worth more than one million dollars, but fraudulently failed to inform the appellant or Mrs. England of the strike he had made, or of the value of the claim in question, but concealed from them his claim that he alone owned the property, denying any rights of appellant and at all times led the latter to believe the property was of little or no value.

It does not appear how long appellant stayed in California or when, if ever, he returned to the vicinity of the property. It was not until the year 1919 that he learned of the fraudulent acts of the respondent, or that the latter claimed he was the sole owner of the property, or that the claim had turned out to be very valuable, or that the respondent had taken therefrom gold of the value of more than a million dollars. As soon as possible after appellant learned of the value of the claim and of respondent's fraudulent practices, he demanded a settlement, which was refused, and he was compelled to, and within a reasonable time after the discovery of such fraud, did institute this action. Although respondent used his fraudulent schemes to defeat the interests of Mrs. England, some years ago she learned thereof and forced him to settle with her. The appellant demands judgment for one-third of one million dollars taken from the claim, and that it be adjudged that he has an undivided one-third interest in the property.

Certainly the appellant is not entitled to a more favorable construction of the facts alleged than as above set out. Indeed, it might well be argued that we have stated them too much in his behalf.

It is our opinion that the appellant's demand is stale.

It is probable that the complaint alleges sufficient to show that the respondent has acted fraudulently, but in a case of this character that is not sufficient. The appellant owed some duty to himself. The law of self-protection may not be written into our statute books, but every man knows it is a part of human nature. Appellant's interest in the claim was initiated in 1901. Almost at once thereafter the alleged fraudulent acts of respondent commenced. Within a short time he took from the mine more than a million dollars, and yet appellant did not learn of these frauds and of these facts until 1919. What active steps did he take during all these years to learn whether he was being defrauded? Apparently none. What did he do to protect his own property rights? Apparently nothing. He knew he had an interest in this property and that he was dealing with a comparative stranger; and yet, for fifteen or eighteen years, he did nothing to learn the condition of the property or its value, or what was being done with it, or who was claiming it. It would seem that the slightest investigation on his part would have lead him to facts and circumstances pointing to the fraud alleged and indicating the great value of the mine. It would seem impossible that such a large amount of value could be taken from such a small tract of land without all the public within the vicinity being acquainted with the fact. For fifteen or eighteen years the appellant sat idly by. Meanwhile some of the persons acquainted with the facts have died, and the great

lapse of time has dimmed the memory of others. After fifteen years of inaction, he calls upon us. Such a voice does not stir the conscience of a court of chancery. Ordinarily, equity puts out its assisting arm only to those who have shown a disposition to help themselves. The correct theory with reference to matters of this character was forcefully expressed by one of our deceased associates, in the case of *Ferrell v. Lord,* 43 Wash. 667, 86 Pac. 1060, as follows:

"Where a case is of purely equitable cognizance, in the application of the doctrine of laches courts of equity act upon their own inherent doctrine of discouraging, for the peace of society, ancient demands, and refuse to interfere where there has been gross laches in prosecuting the claim or long acquiescence in the assertion of adverse rights. In such cases the statute of limitations does not necessarily govern the court in the application of the doctrine of laches. . . . Regard must be had to all of the facts and surrounding circumstances, and if, when carefully considered, they do not appeal to the conscience of the chancellor, on behalf of a claimant, the defense of laches should be allowed."

In *Noyes v. Parsons,* 104 Wash. 594, 177 Pac. 651, we said:

"A general allegation of ignorance at one time and knowledge at another is of no effect. . . . In order to excuse the want of knowledge of the fraud, a pleading must set forth what were the impediments to an earlier prosecution of the claim, how the pleader came to be so long ignorant of his rights, the means, if any, used by the opposing party fraudulently to keep him in ignorance, or how and when he first obtained knowledge of the matter alleged in the pleading."

A defrauded party must be diligent in making inquiry. The means of knowledge are equivalent to knowledge. It could not have been difficult for the appellant to have ascertained that his property had

been acquired by the respondent as his own, and so claimed and operated. Ordinary diligence on his part would have discovered this fact. With the strongest motives for action, he was supine. If there was'fraud, he did nothing to unearth it.

This seems to us to be a clear, clean case of seeking to enforce a claim which is unquestionably stale. The demurrer was properly sustained; the judgment is affirmed.

FULLERTON, HOLCOMB, and MITCHELL, JJ., concur.