Milton E. DAM and Everett S. Dam, co-partners doing business under the firm name and style of Dam Brothers, Plaintiffs,

v.

GENERAL ELECTRIC COMPANY, a foreign corporation, Defendant.

No. 1036.

United States District Court
E. D. Washington, N. D.

Aug. 27, 1956.

See also 111 F.Supp. 342.

Phipps & Phipps, Spokane, Wash., for plaintiffs.

Hamblen, Gilbert & Brooke, Spokane, Wash., for defendant.

DRIVER, Chief Judge.

Defendant, General Electric Company has moved for summary judgment. The motion is based upon a number of grounds, but only limitation and laches, set up as affirmative defenses in defendant's answer, will be discussed. The others clearly appear to involve genuine issues of material fact and will not, therefore, be considered.

The second amended complaint, as further amended by deletion and interlineation, consists of three "causes of action." The third involves only a defendant not now before the court. The allegations of the first "cause of action," in so far as they are pertinent to the present inquiry, may be briefly summarized as follows:

The plaintiffs, who had for some time conducted investigations, surveys, and studies of the feasibility of developing and utilizing the Priest Rapids site on the Columbia River in the state of Washington (primarily for the irrigation of a large area of adjacent arid land, and, secondarily for the generation of electric power), in 1910 formed a partnership for the furtherance of that project. The partnership operated under the name of Dam Brothers and through the contributions of the individual members, and by their joint efforts, the partnership ac-

quired the control of the lands in what was known as the Priest Rapids Highlands Project, consisting of approximately 135,000 acres of land owned by approximately 1,000 landowners. Originally plaintiffs contemplated diverting the waters of the river for irrigation without constructing a dam or other obstruction to navigation.

For about three years prior to 1913, defendant had been considering the development of the Priest Rapids site, primarily for electric power purposes by the construction of a high dam across the river. Defendant encountered serious difficulties, however. It discovered that its plans would interfere with the project of plaintiffs and that the Columbia river was a navigable stream under the control of the Federal government, and that the development of a hydroelectric power project at Priest Rapids was not feasible until favorable amendment of the Federal laws pertaining thereto could be secured.

On learning of such obstacles, defendant proposed to plaintiffs that they jointly develop the Priest Rapids project for both power and irrigation purposes and suggested that a meeting be held in New York City to work out the details of such a joint enterprise.

The meeting was held and the principal representative of defendant was Charles A. Coffin, originally its president and then chairman of its board of directors. Defendant also was represented by Sidney Z. Mitchell, President and Managing Director of Electric Bond & Share Company (a corporation completely dominated and controlled by defendant), and Henry Pierce, also connected with Electric Bond & Share Company. As a result of the meeting and negotiations carried on in the year 1913, the plaintiffs, and the defendant through its agents Coffin, Mitchell and Pierce, entered into an oral joint venture agreement for the development of the Priest Rapids site.

In the joint venture agreement, the plaintiffs on their part agreed to, 1) abandon their own plans to develop Priest Rapids and join with defendant in the development thereof; 2) assist in securing additional power and industrial sites and lands to be turned over to defendant and its subsidiaries for construction of a dam for the generation of power and for irrigation purposes upon the passage of favorable Federal legislation; 3) make available to defendant all of plaintiffs' "records, investigations, field logs, field work and knowledge" with reference to the irrigation and power development; 4) jointly acquire with defendant 55,000 acres controlled by plaintiffs, being railroad grant lands, and to endeavor to secure control over other privately owned lands in furtherance of the irrigation feature of the joint project; and 5) employ plaintiffs' resources and efforts to obtain the enactment by the Congress of the United States of favorable water power legislation which would make it feasible to develop the Priest Rapids site.

On its part, defendant by the joint venture agreement, undertook to, 1) "allot" to plaintiffs $500,000 worth of common stock of a corporation to be known as the Priest Rapids Power Company which defendant would cause to be organized and incorporated with par value capital stock of $40,000,000 upon the passage of favorable legislation affecting the Priest Rapids power site; 2) give plaintiffs a 30% interest in a land-holding "syndicate" to be formed immediately following the making of the joint venture agreement for the purpose of acquiring the 55,000 acres of railroad grant land, which syndicate was to be jointly controlled by plaintiffs and defendant; 3) deliver to plaintiffs a 10% stock interest in corporations to be formed, to be known as the Terminal Townsite Company "and other companies" for the purpose of developing industrial and transportation facilities in the vicinity of the Priest Rapids site, which corporations were to be formed and organized "immediately following" the passage of favorable Federal power site legislation; 4) allot and deliver to plaintiffs a 10% interest "in any and all of the various syndicates or corporations" to be formed or organized

for the purpose of acquiring or developing mineral rights, minerals, and building materials in connection with the Priest Rapids project; and 5) directly and through its subsidiaries, furnish all necessary funds and pay all expenses "during the pre-construction and construction period", and "diligently prosecute all necessary activities and perform all acts necessary or required for the fruition and realization of the plans and prospects of the parties for the development of said Priest Rapids site for power and irrigation purposes".

Plaintiffs generally performed their part of the joint venture agreement and specifically assisted in various ways in securing the enactment of favorable water power legislation by the Congress of the United States. The passage of the legislation was delayed because of the insistence of the defendant upon the inclusion of provisions which the Congress would not accept; but such legislation was enacted into law in March, 1920.

In further performance of the joint venture agreement plaintiffs acquired "for the land syndicate formed for such purpose" the 55,000 acres of land for irrigation, and other lands; and acquired Tufa mineral deposits immediately adjacent to the proposed dam and town site, which deposits, it was agreed, were to be turned over to a corporation to be organized as the Tufa Natural Cement Company.

After the enactment of the favorable water power legislation in 1920, defendant through its various subsidiaries procured a permit, and later, a license, to construct the proposed dam at Priest Rapids, and performed preliminary diamond drilling and engineering work in preparation for the construction of the dam. The permit was granted about the year 1925. Defendant assured plaintiffs that it intended to proceed immediately with the construction of the proposed project, and plaintiffs believed and relied upon such assurance.

Defendant at no time abandoned the performance of the joint venture agreement on its part and at all times advised and assured plaintiffs that it still intended to proceed with the proposed plans, which assurance plaintiffs believed and relied upon, but defendant was hindered and delayed in the prosecution of the work by the general economic depression which began in 1929, and, later on, by the Second World War.

Just prior to the commencement of the action, plaintiffs learned that a subsidiary of defendant had secretly sold and disposed of lands of the land syndicate, thus putting it beyond the power of the defendant to perform the joint venture agreement. On June 14, 1951, plaintiffs made written demand upon defendant to complete the performance of the joint venture agreement, to which demand there was no response. The present action was then instituted promptly. (The complaint was filed on July 16, 1952.)

As a direct and proximate result of defendant's failure to perform the joint venture agreement, and the necessary change of position of plaintiffs brought about by the performance of their part of the agreement, plaintiffs have been injured and damaged in the total sum of $8,550,000.

In the second cause of action plaintiffs incorporate by reference all the allegations of the first cause of action, and in addition thereto allege in substance that defendant used the knowledge, experience and efforts of the plaintiffs during the period covered by the joint adventure and as a result thereof obtained favorable Federal water power legislation "and other advantageous positions and situations" from which defendant received "enormous profits" which cannot now be determined by these plaintiffs.

In the prayer of the second amended complaint the court is asked to find that, 1) the parties made the joint venture agreement; 2) the defendant has "wholly failed, neglected and refused to complete, carry out and perform * * *" the same, and has "put it beyond its power to so perform"; and 3) as a result of defendant's failure to perform, the plaintiffs have materially changed their position and have been injured and damaged

thereby in the sum of not less than $8,-550,000.

The following additional uncontroverted facts appear in affidavits and other documents filed in support of the motion for summary judgment:

Charles A. Coffin, who was the first president of General Electric Company, was 69 years of age when the oral joint venture agreement was alleged to have been made in 1913. He retired in 1922, and died July 14, 1926. Henry J. Pierce died at some time prior to 1935. Sidney Z. Mitchell, a former president of Electric Bond and Share Company, died February 17, 1944.[1]

Diligent search and inquiry by one of defendant's attorneys has failed to disclose that Priest Rapids Power Company, Terminal Townsite Company, or Tufa Natural Cement Company were ever incorporated, and the records of the Secretary of State of the State of Washington, the official custodian of corporate records, show that none of the three corporations just named has qualified to do business in that state either as a foreign or domestic corporation, subsequent to the year 1912.

The following appears from the records of the Federal Power Commission in Washington, D. C.: On June 12, 1920, the Washington Irrigation & Development Co.,[2] under the Federal Water Power Act of 1920, 16 U.S.C.A. § 791a et seq., applied for a preliminary permit for a power project (Project No. 3) on the Columbia river at Priest Rapids. The permit was granted on March 3, 1921, followed by the issuance of a license to the company in March, 1925. A requirement of the license was that construction be commenced on or before March 1, 1929. The license was terminated by the Commission on June 14, 1929 because of the licensee's failure to commence construction within the required time. On February 28, 1929, the company had filed an application for a new license for the same project, which second application was denied by the Commission on July 1, 1930, for the reason that the applicant had failed to submit satisfactory evidence of its ability to market the power to be produced and to finance the proposed development. On July 2, 1930, the Commission's executive secretary notified the applicant by letter that the second application was denied and the file was closed. Thereafter, there was no activity regarding Priest Rapids on the Columbia river in the state of Washington after rejection of the application and closing of the file on Project No. 3 of the Washington Irrigation and Development Company to July 16, 1952, when the present action was instituted.

This court's jurisdiction is based upon the diversity of citizenship of the parties and the substantive law to be applied is the law of the state of Washington.[3] The parties are to have the same kind of trial they would have in the state court, and any law of the state which would substantially affect the outcome of the lawsuit must be regarded as substantive and be followed by the federal court.[4] It is a well-established general rule that all matters of procedure, such as the limitation of time in which an action may be brought, where the limitation pertains to the remedy

---

1. In an affidavit resisting the motion for summary judgment, plaintiff Milton E. Dam mentioned Edwin W. Rice, Jr., "President, associate and assistant of Mr. Coffin" as taking some part in the making of the oral joint venture agreement, but according to an uncontradicted counter-affidavit, Edwin W. Rice, Jr., who was president of defendant corporation from 1913 to 1922, died November 25, 1935.

2. For the purpose of deciding the motion for summary judgment it will be assumed that the company was a dominated subsidiary and agent of defendant.

3. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

4. Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832; Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520; Woods v. Interstate Realty Co., 337 U.S. 535, 69 S. Ct. 1235, 93 L.Ed. 1524.

rather than the right, are governed by the law of the forum.[5] It is my view, therefore, that the law of the state of Washington is controlling as to whether or not plaintiffs' action was commenced within the time limited by law.

■■ Plaintiff's first cause of action clearly appears to present a claim for damages for breach of an oral contract. Plaintiffs in one of their written briefs referred to it as an action for specific performance of a contract. The reference is not warranted in view of the allegations of the second amended complaint that, defendant has by its conduct made performance on its part impossible. Moreover, one of the principal objects of the contract was the construction of a dam across the Columbia river at the Priest Rapids site for the generation of electrical energy, and the court will take judicial notice that a permit for the building of such a dam at the same site has been issued by the Federal Power Commission to the Grant County Public Utility District, and at least preliminary work on the project has been commenced. RCW 4.16.080, subd. (3), provides that, "An action upon a contract or liability express or implied, which is not in writing, and does not arise out of any written instrument" must be commenced within three years after the cause of action accrued. The statute by its express terms applies to plaintiffs' first cause of action.

■ The second cause of action presents a claim for recovery for unjust enrichment of the defendant. Although an action based on such a claim is equitable in its nature,[6] the Washington State Supreme Court has squarely and unequivocally held in two recent cases that the three-year statute of limitations mentioned above is applicable to an action for unjust enrichment.[7]

Both causes of action must depend upon the existence of the oral contract. The first, as has been stated, is to recover damages for its breach. The second, which necessarily must be alternative, is based upon the principle that, if for any reason the contract is legally unenforceable, then plaintiffs are entitled to recover for the unjust enrichment of defendant which has resulted from the performance by plaintiffs of their obligations under the contract. The right of action on both causes of action accrued when defendant breached the contract and made it clear by its acts and conduct that its part of the contract would not be performed.

■ By the oral joint venture contract, defendant agreed immediately after the passage of Federal water power legislation to organize a corporation to be known as the Priest Rapids Power Company with a capital stock of $40,000,000, and to turn over $500,000 worth of the stock to the plaintiffs; to organize a corporation to be known as the Terminal Townsite Company, and transfer 10% of the stock to plaintiffs; and diligently to build a dam across the Columbia river at the Priest Rapids site, and allied works for the generation of electrical energy, and the irrigation of arid lands. The passage of the Federal water power legislation occurred in March, 1920. There is no allegation that defendant caused any corporations to be incorporated or transferred any stock in any corporation to the plaintiffs. It may properly be inferred from the defendant's uncontroverted showing on that point that no corporation was ever organized. Defendant's failure to do so breached the contract. Defendant did not build the dam and plaintiffs did not commence their action until 32 years after the passage of the Federal water power act. Defendant did procure a license from the Federal Power Commission to build the dam, it is true, but the license was finally canceled

5. Restatement, Conflict of Laws, § 585, p. 702; 15 C.J.S., Conflict of Laws, § 22, p. 948.

6. Bill v. Gattavara, 34 Wash.2d 645, 650, 209 P.2d 457. See, also, Lloyd v. Ridgefield Lbr. Ass'n, 38 Wash.2d 723, 231 P.2d 613.

7. Halver v. Welle, 44 Wash.2d 288, 266 P.2d 1053 (En Banc, Feb. 19, 1954); Geranios v. Annex Investments, 45 Wash.2d 233, 273 P.2d 793.

and the file closed on July 2, 1930. The file was never reopened. The very fact that defendant during the ensuing 19 years made no further application for a permit to build a dam should have been sufficient indication to anyone making inquiry that the project had been abandoned so far as defendant was concerned. Under the facts as above stated, it seems clear that plaintiffs' causes of action must have accrued at least 3 years prior to July 16, 1952. Let us assume that under the same state of facts plaintiffs had brought this same action against defendant on July 1, 1949. What, may we suppose, would have been the prospects of a successful defense to the action on the ground that it had been prematurely brought—that 29 years was not a sufficient, reasonable time to allow defendant for performance of its part of the oral agreement?

In the numerous written memoranda and lengthy affidavits submitted by plaintiffs and their attorneys, expression is repeatedly given to the thought that the instant case is a very unusual one and, because of its peculiar circumstances, plaintiffs are entitled to equitable relief and the statute of limitations should not be interposed to bar recovery. If both causes of action should be regarded as equitable in character, recovery would nevertheless be precluded because of laches on the principles announced and applied by the Supreme Court of Washington in Teeter v. Brown, 130 Wash. 506, 228 P. 291, and Kilbourne v. Kilbourne, 156 Wash. 439, 287 P. 41. In each of the cases the plaintiff had remained inactive and failed to make inquiry or take measures for self-protection for a period considerably shorter than the period of time involved in the instant case. In Teeter v. Brown, supra, the reason for the court's decision is clearly stated in the following quotation from the opinion, beginning 130 Wash. on page 509, 228 P. on page 291:

"It is probable that the complaint alleges sufficient to show that the respondent has acted fraudulently, but in a case of this character that is not sufficient. The appellant owed some duty to himself. The law of self-protection may not be written into our statute books, but every man knows it is a part of human nature. Appellant's interest in the claim was initiated in 1901. Almost at once thereafter the alleged fraudulent acts of respondent commenced. Within a short time he took from the mine more than $1,000,000, and yet appellant did not learn of these frauds and of these facts until 1919. What active steps did he take during all these years to learn whether he was being defrauded? Apparently none. What did he do to protect his own property rights? Apparently nothing. He knew he had an interest in this property, and that he was dealing with a comparative stranger, and yet for 15 or 18 years he did nothing to learn the condition of the property or its value, or what was being done with it, or who was claiming it. It would seem that the slightest investigation on his part would have [lead] him to facts and circumstances pointing to the fraud alleged and indicating the great value of the mine. It would seem impossible that such a large amount of value could be taken from such a small tract of land without all the public within the vicinity being acquainted with the fact. For 15 or 18 years the appellant sat idly by. Meanwhile some of the persons acquainted with the facts have died, and the great lapse of time has dimmed the memory of others. After 15 years of inaction he calls upon us. Such a voice does not stir the conscience of a court of chancery. Ordinarily, equity puts out its assisting arm only to those who have shown a disposition to help themselves."

Plaintiffs have cited Washington cases on the point that, lapse of time alone is not sufficient to constitute laches—that there must also be shown some disadvantage to the party asserting the defense.

The cases are not in point here. In the present case, plaintiffs' action is based upon an oral contract alleged to have been made in 1913, and they did not commence the action until 1952, eight years after all of the individuals whom they claim acted for the defendant corporation in making the contract had died. The plaintiffs, according to the allegations of their own pleading, did not make a formal written demand upon the defendant for the performance of the oral contract until 1951, many years after the last survivor of defendant's potential witnesses regarding the oral agreement had passed away. It is difficult to imagine a litigant being put to more serious disadvantage than to be called upon to defend against an eight and one-half million dollar lawsuit based upon a 39-year-old oral contract, when the only witnesses who could possibly testify in behalf of the defendant as to whether or not the contract was actually made, and, if so, as to what were its terms and conditions, have been dead for eight years or more.

In McKnight v. Basilides, 19 Wash.2d 391, 143 P.2d 307, the Washington State Supreme Court had occasion to apply the principle above mentioned that, laches does not arise from lapse of time alone, but there must also be involved some intervening change in the condition or relation of the parties adversely affecting the rights of the party sought to be charged. The case is factually distinguishable from the instant one, but it is significant that, in discussing the subject of laches, Judge Simpson, who wrote the court opinion, made the following comment, 19 Wash.2d at page 403, 143 P.2d at page 313:

"The lapse of time did not obscure any evidence in this case. All of the witnesses who could have testified relative to the situation and condition of the property in 1929 were available at the trial of this case, and there is no showing that any material documents were lost or destroyed."

If the Washington 3-year statute of limitations does not apply, recovery is precluded by laches.

Defendant's motion for summary judgment is granted.